JOSEPH WALTER ET AL., APPELLEES V. IGNATIUS WALTER ET AL., APPELLANTS.

FILED NOVEMBER 28, 1928. No. 26107.

*Courtright, Sidner, Lee & Gunderson,* for appellants.

*Dolezal, Spear & Mapes* and *Hugo F. Srb, contra.*

Heard before GOSS, C. J., ROSE, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

REDICK, District Judge.

This case was presented to the commission, division No. 1, and an opinion written affirming the judgment of the district court. A motion for rehearing allowed, and reargument had before the court.

The action is in equity by two tenants in common to quiet title to certain lands against two of their cotenants and the heirs of a third cotenant. The claim of the plaintiffs is based upon adverse possession for a period of 10 years and involves a farm of 80 acres, which will hereinafter be designated as tract B. The history and chronology of the facts to be considered will now be stated.

Joseph Walter, Sr., in 1875, became the owner of the north half of the northwest quarter, section 8, township 20, range 5. This will be referred to as tract A, but it is not in controversy in this action. March 31, 1883, Joseph purchased from the Union Pacific Railroad Company the east 40 acres, and on June 9, 1888, the west 40 acres, which together constituted the south half of the northeast quarter of section 7, township 20, range 5. This is tract B, the land in controversy, and corners on tract A at the southwest. Title to both tracts was in Joseph Walter, Sr., who lived with his wife and family on tract A, farming the same in the usual manner. October 11, 1880, Joseph, Sr., and wife, Anna, entered into a contract with their son Anton whereby tract A was to be conveyed to Anton in consideration that he would deliver to Joseph and Anna Walter, so long as either of them should live, one-fourth of all crops raised thereon and permit them to occupy the north half of the house on said premises, and by the same contract personal property of the value of $150 was transferred to Anton. The deed was executed in pursuance of this contract and filed for record October 26, 1880, and

the contract October 27, 1880. The suggestion that the deed formed the entire contract of the parties because it contained no reservation finds no support in the evidence which clearly requires the inference that it was executed in pursuance of the contract. From that time forward Anton conducted the farm on tract A, and after the purchase of tract B, with the apparent permission of his father, cultivated and managed that tract, both tracts being used as one farm. The transaction appears to have been simply a substitution of Anton for his father in the management of the farm because of the latter's advancing years.

Joseph, Sr., died December 19, 1892, leaving surviving him four children, Joseph M. II, Ignatius, Mary K, Anton, and Anna, his widow. Anna continued to live on the farm until her death September 22, 1900.

Anton Walter died February 2, 1913, leaving surviving him six children, Rosa, Frank, Anton, Mary, Joe, and Otillie, and Mary, his widow. These are all living.

Joseph M. II died June 23, 1893, leaving surviving him four children, Fannie, Victor, George, Joseph III, and Clotilda, his widow, all defendants herein.

Upon the death of Joseph, Sr., title to the tract in question descended to his four children in equal shares, subject to the interest of Anna as widow, and upon the death of Joseph M. II, his one-fourth passed to his four children and Clotilda, his widow.

At the death of Joseph M. II in 1893, therefore, the record title was vested in Ignatius, one-fourth, Mary K, one-fourth, Anton, one-fourth, and the children of Joseph II, one-fourth, subject to the rights of the widows, which are not in controversy. The title has so remained up to the present time, except that the children of Anton succeeded to his interest February 2, 1913, four of whom, Rosa, Frank, Anton, and Mary, quitclaimed to Joe and Otillie, plaintiffs, May 10, 1913. This suit was brought January 2, 1924.

The action is brought against Ignatius and Mary K. and the four children of Joseph II and their respective wives and husbands, where, married, and the claim of plaintiffs is that they and their ancestor, Anton Walter, have been in the actual, exclusive and adverse possession of the tract in controversy for more than ten years, and they pray that their title may be quieted as against the other defendants. Issue was joined by the filing of a joint answer and cross-petition praying for partition and an accounting of the rents and profits, to which plaintiffs filed a reply alleging that defendants were guilty of laches and other matters in the nature of estoppel, not necessary to be detailed at this point. The district court found for the plaintiffs and entered a decree quieting their title. Joseph III filed a separate motion for new trial, the others joining in a similar motion, which motions were overruled, and defendants appeal to this court.

As we view it, there is but one question to be determined, and that is whether or not the plaintiffs by the evidence have established an ouster of their cotenants so as to start the running of the statute of limitations.

It is well established that the possession by one cotenant of common property will be presumed to be friendly as regards his contenants, and that, before such possession can become adverse, notice by the tenant in possession that he claims title, or that his possession is hostile as against his cotenants, must be brought home to them in some plain and unequivocal manner. *Beitz v. Buendiger,* 144 Minn. 52. Until such notice is shown the law presumes that the possession is for the benefit of all the cotenants. 38 Cyc. 21. This notice need not be direct and positive, but may be inferred from acts of the tenant in possession, in hostility to the title of his cotenants, of such an open and notorious character as would put a man of ordinary prudence upon his guard. Acts of the tenant, however notorious, which are reasonably consistent with the existence of title in his cotenants are not sufficient, they must be hostile and of such a character as would put a reasonable man,

aware of his rights, upon inquiry. See *Carson v. Broady,* 56 Neb. 648; *Chase v. Lavelle,* 105 Neb. 796; *Keleher v. Kelly,* 89 Neb. 127; *Lambert v. Hemler,* 244 Ill. 254; *Schoonmaker v. Schoonmaker,* 154 Ia. 500; *Campbell v. Humphreys,* 202 Ia. 472; *Hudson v. Coe,* 79 Me. 83; *Patton v. Patton,* 197 Ky. 237. Land having descended to heirs, it is presumed that the possession and management thereof is for the benefit of all. *Stull v. Stull,* 197 Pa. St. 243.

With these principles in mind, we will now examine the evidence as preserved in the record.

The tract in question was not improved except by a fence enclosing it. Twenty-five or thirty acres were cultivated and the remainder used for hay and pasture. There never were any buildings, nor has any one ever lived upon the tract. It was farmed and controlled in connection with tract A as one farm by plaintiffs' ancestor Anton until his death in 1913. Several ditches were dug upon it for the purpose of draining the lower portions. After Anton's death the tract remained in the possession of his widow and children living on tract A and operated in the same manner as theretofore down to the present time. There is not a scintilla of evidence to warrant a finding that the possession of Anton was adverse to Joseph, Sr. In fact, this is not claimed by plaintiffs; nor do we find any evidence of any facts brought home to the knowledge of defendants which would put them upon notice of any hostile claim by Anton during his lifetime. The existence of the fence enclosing the property and the digging of the drainage ditches are both consistent with the existence of title in the cotenants and afford no inference of a hostile claim by the tenant in possession. It follows that the ouster, if any, must have taken place after Anton's death in 1913.

The plaintiffs rely upon the following facts and circumstances to show ouster: Anton Walter died testate leaving a will devising and bequeathing his property, real and personal, to four of his children, excluding plaintiffs, Joe and Otillie, who were not mentioned in any way. The

will disposed of real estate in Knox county, but made no disposition of the tracts A and B, which are in Dodge county. This failure to include any Dodge county property is attempted to be accounted for in an affidavit of Frank Dolezal, attorney for plaintiffs, recorded April 24, 1917, in which he says: "That the complications in said estate arose on account of the fact that the said deceased by conference with his family had worked out a plan of willing his property and had been mistakenly advised that there would have to be a separate will for his property in Dodge county and another separate will for his property in Knox county, and that deceased had made the will for the property in *Dodge* county, and before completing his will for the property in Knox county, he died, and the family desired to have his wishes carried out the same as if he had completed the will for this property in *Knox* county. It was for this reason that the agreement and stipulation and transfer of interest was made." It is evident that the words "Dodge" and "Knox" were inadvertently transposed as the will of the Knox county property was complete.

Ignatius was a witness to his brother's will, and on the trial was asked whether anything was said at the time the will was drawn about this 80 acres, and he answered, "Yes." "Q. What did you say? A. I served notice that he could not will anything that did not belong to him." Plaintiffs claim this answer shows conclusively that Anton was claiming the land in 1912. On cross-examination witness testified that this had reference to the *east* eighty. Frank Walter, Anton's son, testified that in 1913, shortly after Anton's death, he and Ignatius made an examination in the register of deed's office of Dodge county, and that, opening a record book which was handed to them, containing the record of the eighty in question, he said: "Here it is; it is in grandfather's name, and should be in your father's name." This was denied by Ignatius. Ignatius was named executor in Anton's will, but declined to serve and took no further part in the

settlement of Anton's estate beyond testifying as a witness to the will. The inventory in that estate included both tract A and tract B. Objections to the probate of the will were filed by Joe and Otillie March 4, 1913, because they were not mentioned in the will, and in order that the will might be probated an arrangement was entered into between the heirs of Anton that the personal property and the two tracts in Dodge county should be turned over to plaintiffs, with the results that the other children of Anton took the lands in Knox county under the will, and the quitclaim deed above referred to, dated May 10, 1913, was executed in pursuance of that arrangement. The widow was awarded a homestead interest in both tracts. This arrangement was made about May 10, 1913, the quitclaim deed to plaintiffs executed that date and recorded June 11, 1913. Inventory in the estate was filed December 6, 1913; final decree and discharge of administrator filed February 14, 1916; distribution of estate in Dodge county was based upon and in accordance with the arrangement between the heirs as appears from recitals of the decree. January 1, 1922, in reply to a letter from Joe, Ignatius wrote, saying: "A quitclaim is no good and some day you must go into the district court and have that deed corrected and that will cost money, too." Prior to this, in 1921, Joe had asked his uncle for a quitclaim deed and been refused. There was a claim, not now insisted upon in the briefs, that Anton had paid for the eighty in dispute. This letter may have referred to this claim—that title should have been made to Anton instead of Joseph, Sr. The evidence does not disclose a discussion of an adverse possession, either at the register of deeds' office or in connection with this letter. The letter to which it was an answer was not produced.

In 1893 Ignatius was administrator of his brother's (Joseph II) estate and did not include in his inventory the undivided one-fourth of the tract in Dodge county which he now claims his brother owned. February 14, 1916, Mary Walter, widow of Anton, quitclaimed to plaintiffs

tracts "A and B," reserving a homestead interest "to assure the carrying out of the understanding and agreement on which the last will and testament *after* deceased husband was probated."

The quitclaim deed of the four other children of Joseph II to plaintiffs covered both tracts and contained the following recital: "This is to quitclaim the apparent interest of grantors as heirs at law of Anton Walter, deceased, to grantees who are also heirs at law of said deceased to effect disposition agreed on." Anton paid the taxes on tract B which was assessed in the name of Joseph, Sr., until Anton's death, after which it was assessed to Joseph Walter et al. After Anton's death his widow paid the taxes until "a few years back"—"then I paid them, I always paid the taxes for her," Joe Walter testified.

It being conceded that it is incumbent upon the plaintiffs to prove an ouster of their cotenants, what is there in all this testimony (leaving out of view for the present the effect to be given the fact of such possession and occupancy as plaintiffs have shown) which tends in any manner to establish an ouster? There is no evidence of any positive notice to defendants that plaintiffs claimed the title adversely to them until the year 1921, when Ignatius was asked for a quitclaim deed, about five years before the beginning of the suit. The statement by Ignatius to his brother that he could not will anything that did not belong to him, according to Ignatius, had reference to the east eighty, which he says his father was about to put into the will. This eighty had been conveyed by the father to Anton in 1880. The incident referred to by Frank Walter at the register of deeds' office, when Ignatius is claimed to have said with reference to the eighty in question, "It is in grandfather's name, and should be in your father's name," might be evidence against Ignatius, but not against the other defendants. Ignatius denies this incident *in toto*. The same may be said of the fact that Ignatius, as administrator of the estate of Joseph II, in Knox county, failed to include in the inventory the one-

fourth interest which he now claims Joseph II had in the land in controversy. The arrangement made between the children of Anton Walter, upon objection being made to the probate of Anton's will, was one in which the defendants had no interest. They were not heirs or devisees of Anton, and the only connection Ignatius had with the matter was as a witness to the will, he having declined to act as executor. It is not shown nor claimed that any of these defendants were parties to that arrangement, nor, for that matter, had any knowledge of it. The fact that the land in question was included in the inventory of Anton's estate does not bind the defendants, but is explained upon the record itself. The arrangement was made in 1913, the quitclaim deed to plaintiffs being executed May 10 and recorded June 11 of that year. The inventory was not filed until December 6 following, and the decree of distribution recites that it was made in accordance with the stipulation and arrangement of the parties. The inventory, the same as the decree, was made after and in conformity with the arrangement between the heirs of Anton. It is argued that the recording of the quitclaim deed dated May 10, 1913, was notice to defendants of the hostile claim of the plaintiffs; but this is incorrect for several reasons. The deed included both tracts, A and B, and purported to convey only "the apparent interest of grantors as heirs at law of Anton Walter, deceased." What was the *apparent* interest of grantors? It was their two-thirds interest in the one-fourth interest which their ancestor Anton received in tract B as one of the four children of Joseph, Sr. The title to the land was in Joseph, Sr., and upon his death the apparent title was in his four children. The deed does not purport to convey the entire tracts, but only their apparent interest, which is as above stated. Clearly this was no notice to defendants of a hostile claim by plaintiffs, because it only dealt with an interest which plaintiffs are conceded to hold, to wit, one-fourth. It also conveyed their apparent interest in tract A, as heirs of Anton. The decree and proceedings in

Anton's estate were not notice to defendants, because they had no interest in that estate.

The deed of Mary Walter to plaintiffs cannot be considered as notice because it was dated February 14, 1916, and, therefore, within the ten year period.

We are, therefore, brought to the question whether or not the possession of plaintiffs and their ancestor was of such a notorious and exclusive character as to amount to an ouster. What was the nature of this possession and in whom was it vested? It must be borne in mind that we are not concerned with the possession of tract A beyond the fact that it was the home place and had always been farmed in connection with the land in dispute as one tract. At the death of Joseph, Sr., the title and ownership of A was in Anton, while that of B was in Joseph, Sr. Tract A was the homestead of Joseph and his wife, Anna, by virtue of the reservation in their deed to Anton; and tract B was a part of the home farm of Joseph, Sr., and was subject to the homestead right of his widow, Anna, who was entitled to the possession thereof during her life. It would seem, therefore, that the possession of tract B, as well as tract A, would be referable to Anna's title as widow, and not to plaintiffs and other children of Anton who lived with her and assisted her in carrying on the farm. She died in 1900, after which event, Anton became the full owner of tract A and of one-fourth of tract B and continued in possession of both tracts until his death in 1913, since which time his widow and heirs have remained in possession making no claim brought home to the notice of the defendants of any hostility to their interests as heirs of Joseph, Sr., along with plaintiffs' ancestor, Anton, until 1921. There were no buildings upon tract B, no one has ever lived upon it, and the only improvements placed thereon by plaintiffs or their ancestor were the digging of certain ditches to drain the lower portions of the tract, which was done by Joe some time after 1914.

We find nothing in the character of this possession calculated to give notice of a hostile claim by plaintiffs. The

fence existed before the death of Joseph, Sr., and the digging of ditches was not an act of such notoriety as to furnish such notice. It was only such an act as would be done by an ordinary tenant seeking to make profitable use of the land. Morever, they were dug within the ten year period.

Plaintiffs confidently rely upon the case of *Lund v. Nelson*, 89 Neb. 449, and quote the syllabus thereof in the following language: "Where one tenant in common enters upon the whole estate, improves it, takes the profits, pays all the taxes, makes it his home, and claims the whole for more than the period of the statute of limitations, an actual ouster should be presumed although not otherwise proved."

As applied to the facts of that case the statement of the law is doubtless correct, but what were the facts to which it was applied? Plaintiffs' ancestor had purchased in 1890 from the defendant Renstrom a twenty-four twenty-fifths interest in the land in question, had taken possession, built buildings, made other extensive improvements, and made the same his home up to the time of his death, after which his family remained in possession, constructing buildings and farming it as owners, paying the taxes and receiving the income; the names of the original owners of the one twenty-fifth interest were unknown, and the action was against the original grantor, Renstrom. It was said in a concurring opinion by Root, J., that the appellant Renstrom "had no title to or interest in this land, is not a tenant in common, and the question of adverse possession does not arise in the case." It thus appears that there was a difference of opinion among the judges as to the existence of any title in the defendants, but the case was decided upon the proposition that the general rule, that the possession of one tenant in common is the possession of all, was not applicable to that case, and that ouster would be presumed from the state of facts proved. We are not disposed to give effect to so general a statement of the rule beyond the facts of the case in which it was announced.

In the instant case the only improvements made were digging some ditches, but these were dug within ten years prior to commencement of this suit. The possession was in connection with the east eighty. As above stated, this possession after death of Joseph, Sr., might be referable to Anna, his widow, until her death in 1900. So far as Anton and his heirs are concerned, the only acts claimed to be hostile are the payment of taxes, farming the tract and retaining the rents and profits without objection for a period of 31 years. The possssion was by fence, not erected by claimants, the cultivation of about 30 acres, and the use of the remainder for pasture. While these facts might be sufficient to establish adverse possession where the entry was tortious and wrongful, we think they are not enough where entry was presumably permissive and friendly. In the latter case—"Something must affirmatively appear that indicates a purpose to assert title adverse to the cotenants, knowledge of which is chargeable to the other cotenants, before an ouster can be held to have taken place, and the statute of limitations started, on which title by adverse possession can rest." *Campbell v. Humphreys*, 202 Ia. 472, quoting from *Clarke v. Dirks*, 178 Ia. 335. Acts which might be held to constitute a disseisin if done by a stranger may not have such effect if done by one tenant in common against the other tenant. *Hudson v. Coe*, 79 Me. 83; *Warfield v. Lindell*, 30 Mo. 272. Mere possession, receipt of rents and profits and payment of taxes are not sufficient to start the statute of limitations, because the possession was rightful and receipt of the rents and profits made it the duty of the cotenant in possession to pay the taxes for the benefit of all. *Long v. Morrison*, 251 Ill. 143; *Blackaby v. Blackaby*, 185 Ill. 94; *Smith v. Libby*, 122 Me. 156; *Warfield v. Lindell*, 30 Mo. 272; *Schoonmaker v. Schoonmaker*, 154 Ia. 500.

Finally, it is contended that defendants have been guilty of laches in failing to claim their rights as cotenants. We think the doctrine of laches has no application here.

Until notice that their rights were threatened is brought home to them, cotenants are not required to take affirmative action, but may rest secure that the possession of their cotenant is their possession and that payment of taxes is for the benefit of all. "Where one joint tenant is in exclusive possession under the common title, a cotenant cannot lose his right by mere laches in failing to demand admission into joint possession or share of the rents and profits. There must be an ouster operating to give title under the statute of limitations." *Reed v. Bachman,* 61 W. Va. 452. The burden of affirmative action is upon the party in possession, if he wishes to convert a peaceful and lawful possession into a hostile holding. Plaintiffs cite *Butler v. Peterson,* 79 Neb. 715, and *Hawley v. Von Lanken,* 75 Neb. 597. They are not controlling. In both cases the doctrine was invoked against the plaintiff, and in both it appeared that defendants were prejudiced by the delay. In *Hawley v. Von Lanken* the rule was stated: "In applying the doctrine of laches the true inquiry should be whether the adverse party has been prejudiced by the delay in bringing the action and whether a reasonable excuse is offered for the delay." In the present case no such prejudice appears. The cost of the ditches and taxes paid are a lien upon the lands and may be fully recovered upon an accounting between the parties. And, as heretofore stated, defendants were entitled to rely upon their legal rights as cotenants of plaintiffs and their ancestor, thus furnishing a reasonable excuse for not bringing suit. In this connection it is argued that plaintiffs gave up valuable rights in the Knox county lands in reliance upon the undisturbed possession by Anton of the lands in dispute. The plaintiffs received upon the settlement all the personal estate of Anton in Dodge county and the east eighty. The evidence furnishes no clue as to the comparative values of the estate in Knox and Dodge counties, respectively. But for the "family arrangement" in Anton's estate the interest of plaintiffs in the east eighty would have been reduced to one-third, and their interest in Knox county es-

tate would have been one-third, after the payment of $3;000 of legacies and a $3,000 mortgage. No prejudice is shown. It is said in 30 Cyc. 190, that, until a "prescriptive title is created, neither laches nor the statute of limitations will prevent the maintenance of proceedings for partition" —citing cases from twelve states. The rule seems reasonable, for at any time before the statute of limitations is complete action may be brought against the cotenant.

It follows that the opinion by the commission must be set aside and the judgment of the district court reversed, and the cause remanded, with instructions to decree partition and an accounting as prayed in the cross-petition.

REVERSED.