LOUIS UNICK, APPELLEE, v. SAINT JOSEPH LOAN AND TRUST COMPANY, A CORPORATION, ET AL., APPELLANTS.

21 N. W. 2d 752

FILED FEBRUARY 8, 1946. No. 32044.

*Dryden & Jensen* and *W. L. Minor*, for appellants.

*O. A. Drake*, for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

This is a suit in equity to quiet title to a quarter section of farm land in Buffalo County. The trial court found generally for plaintiff and quieted the title in him by reason of

adverse possession. Motion for new trial having been overruled, certain answering defendants appealed to this court. Assignments of error are that the decree is contrary to the evidence and the law. We find that these contentions cannot be sustained.

For purposes of clarity we will, insofar as it is necessary, first identify the parties and their legal relationship. Christian Schaub, deceased 1897, and Louisa Schaub, deceased 1914, were husband and wife. Defendants, Charles W. Schaub and Edward A. Schaub, and one Albert Schaub, who is not a party to this action, are their surviving children. Defendants, Ameal C. Meier and Henry Meier, are their grandsons, the surviving children of a daughter, deceased 1881. John P. Jensen and Kenneth H. Dryden were made defendants by reason of a quitclaim deed, dated April 18, 1945, from Edward and Charles, single, purportedly conveying one-half of their alleged one-half interest in the property involved.

Plaintiff, Louis Unick, received a warranty deed to the property from one John H. Feldman and wife on February 8, 1938, filed February 10, 1938. He bases his right to a decree quieting title in him by tacking his possession and ownership upon that of his grantor who went into possession and claim of ownership by virtue of a warranty deed, dated February 20, 1903, recorded April 13, 1903, whereby Louisa Schaub, widow, and Albert Schaub, single, conveyed all their respective rights to John H. Feldman.

It is conceded that on June 4, 1889, Christian received receipt from the United States Land Office showing final payment made upon the land, together with a promise that deed would be issued, which thereafter followed on February 6, 1891. Defendants contend that an agreement dated May 4, 1890, recorded July 15, 1892, whereby Christian, the father, conveyed the property to Albert in consideration of monthly maintenance payments, medical attention, and housing during the grantor's lifetime, and a warranty deed dated March 11, 1891, recorded March 23, 1891, whereby Christian conveyed an undivided two-thirds interest in the

property to Albert, were both void because the property was the homestead and grantor's wife, Louisa, did not join in the execution of either of the instruments. If that be true, it is apparent that a warranty deed dated March 6, 1895, recorded April 19, 1895, whereby Albert conveyed to his mother, Louisa, the undivided two-thirds interest previously conveyed to him by the father, accomplished nothing.

Upon these premises it is defendants' theory that at the death of Christian, intestate, in 1897, the property descended, by virtue of then existing statutes, to his wife, Louisa, for life with remainder to his heirs, the three sons who each took a one-fourth interest and the two grandsons who each took a one-eighth interest. They argue by analogy that the warranty deed to the property executed and delivered in 1903 to John H. Feldman, plaintiff's grantor, conveyed only the widow's life estate and Albert's one-fourth interest.

It is therefore confidently asserted by defendants: (1) That adverse possession could not be computed against them as remaindermen until after the death of Christian's widow in 1914; and (2) that plaintiff's grantor, Feldman, became thereafter only a tenant in common with defendants who were without any notice or knowledge of Feldman's claim of absolute ownership, thus title by adverse possession could not be obtained by him or by plaintiff through him.

For the purposes of this opinion we may assume, without discussing or deciding the legal propositions relating thereto, that defendants were remaindermen as claimed and apply the recently established rule that: "The period for which adverse possession may be computed begins from the date when a right of entry and a right of possession exist, and not from the date when the remainderman has a right to bring an action to quiet title as to his future interest." Maxwell v. Hamel, 138 Neb. 49, 292 N. W. 38.

Nevertheless, the application of that rule is not decisive of the case. In 1914, if defendants' position is correct as we have heretofore assumed, defendants had a right of entry and possession and Feldman and defendants were

thereafter tenants in common of all the property involved except Albert's one-fourth interest which it is conceded was always Feldman's absolutely by virtue of the warranty deed executed in 1903. In that situation Feldman was thereafter in actual, continuous possession of all the property claiming all of it as absolute owner for a period of 24 years and plaintiff, his grantee, was in actual possession under a like claim for seven years after that time, or a total of 31 years, before these defendants ever asserted any right or title to or any interest in the property. Therefore, the question presented is whether defendants, as cotenants, none of whom were under any disability, had notice or knowledge, actual or constructive, of the hostile claim of plaintiff and his predecessor causing their ouster and barring their present claims by virtue of section 25-202, R. S. 1943, the ten-year statute of limitations.

An ouster, in the law of tenancy in common, has been defined as the wrongful dispossession or exclusion by one tenant in common of his cotenant or cotenants from the common property of which they are entitled to possession. 62 C. J., Tenancy in Common, s. 32, p. 426.

In that connection it is the general rule that possession of real property by a tenant in common is ordinarily the possession of all cotenants and that before their ouster arises notice or knowledge of acts causing their ouster must be brought home to them in some plain and unequivocal manner. However, the notice or knowledge out of which ouster arises need not be actual but may be constructively inferred from acts and circumstances attending adverse possession which are open, notorious, and unequivocal in their character and import. In other words, notice of such hostile claim may be shown by acts of the cotenant in possession of such a notorious and hostile character as would put a man of ordinary prudence upon his guard, but, on the other hand, acts which are reasonably consistent with the existence of title in his cotenants would not be sufficient.

Thus, we have concluded in this jurisdiction that where one tenant in common enters upon the whole estate, sub-

stantially improves it beyond that ordinarily proper for the full enjoyment or use of the estate as a tenant in common, takes all the rents and profits, pays all the taxes, makes it his home and openly claims the whole for more than the period of the statute of limitations, an ouster of his cotenants will be presumed although not otherwise proved. See Severson v. McKenzie, 122 Neb. 827, 241 N. W. 774, which followed Lund v. Nelson, 89 Neb. 449, 131 N. W. 919, and distinguished Walter v. Walter, 117 Neb. 671, 222 N. W. 49, upon the facts. See, also, Aynes v. Bantz, 114 Neb. 226, 206 N. W. 754, and Craven v. Craven, 68 Neb. 459, 94 N. W. 604.

As authoritatively stated in 62 C. J., Tenancy in Common, s. 48, p. 436: "In order to make good the claim of a tenant in common to title by adverse holding, the cotenants out of possession must have notice, or the possession must be so open, visible and notorious as to charge them with knowledge of the hostile claim; and where their knowledge, actual or constructive, is shown, their ignorance or mistake as to their rights will not affect the operation of the statute in the absence of fraudulent concealment or misrepresentation." There is no claim made in the case at bar that there was any fraudulent concealment or misrepresentation.

It is generally held that: "Statutes of limitations governing actions to recover the land, as applied to ousted cotenants, begin to run from the time of such ouster, and, if action is not brought within the statutory period, operate both to bar recovery of the land and to vest title in the disseizor." 62 C. J., Tenancy in Common, s. 43, p. 434. It follows also that possession by one claiming under a disseizing tenant in common, if there is privity between them and the possession of both are adverse, may be tacked to the disseizor's possession so as to perfect title as against the cotenants disseized. 62 C. J., Tenancy in Common, s. 53, p. 441; 2 C. J., Adverse Possession, s. 66, p. 82.

Bearing these rules in mind the evidence becomes of primary importance. We believe the record discloses substan-

tially that after Feldman received his warranty deed on February 20, 1903, he moved upon and took possession of all the property which he farmed and made his home as owner until 1938. For two years thereafter he was plaintiff's tenant. The widow, Louisa, together with Albert and Edward, lived on the property when Feldman moved there. Ameal C. and Henry Meier also lived there part of the time. They all moved off the property at the same time that Feldman moved on to give him possession of the property. In 1903, Charles lived on his own farm adjoining the property on the north. Thereafter he visited back and forth with Feldman in a neighborly way and exchanged farm work with him. Edward and the Meier boys also came on the property as visitors now and then for some time after Feldman took possession.

The fences on the property were in poor condition and Feldman improved them. When he moved upon the place the farm buildings were located near the center of the land. They were not in good condition. In 1917 or 1918, he moved the building site over nearer the section line but on the land involved. There he built a new $4,000 house and a new $2,000 barn. He also constructed a new granary and a new hoghouse, the cost of which are not shown. None of the lumber in the old buildings was used in constructing the new. During the entire period of 35 years, from 1903 to 1938, and 24 years from 1914 to 1938, Feldman took all the rents, income, and profits from and paid all taxes on the land, made the place his home and openly claimed the whole of it as owner. Further, for seven years after 1938, plaintiff was likewise in possession of the property claiming as absolute owner by warranty deed from Feldman before any claim was ever made in any manner to any person by defendants, or any of them, that they had any interest, right or title to the land or the income therefrom. During the period of 24 years, between 1914 and 1938, Feldman actually mortgaged the property, as owner thereof, five different times for sums varying from $3,000 to $9,000. He likewise mortgaged the property, as owner, four times between the

years 1903 and 1914, for sums varying from $800 to $4,800. As owner, he also entered into an oil lease therefor in 1931 upon a royalty basis which was changed in 1932 to an annual rental. All of these instruments were filed of record.

The plaintiff lived in that neighborhood all of his life. In 1903, he lived within a mile and a half of the property. He saw the improvements constructed and saw Feldman living upon and farming the land throughout the years. The plaintiff visited back and forth with the Schaubs. Edward worked just across the road from his place for some time after Feldman took over the property. In 1903, Edward and Charles both told plaintiff that they had sold the place to Feldman and were going to have a sale and move. Edward so admits in his testimony and says he told plaintiff also that he was going to have a new neighbor. Charles did not testify at the trial and plaintiff's evidence with regard to the conversation with him was not denied.

Edward was the only witness for defendants. He denied that he knew about the improvements and says that he was not told about the deeds. He admits, however, that he was on the place when the agent completed the transaction with Feldman and when Feldman took over the property in 1903. He testified that he and the other defendants always understood that Albert or his mother and Albert owned the property and it was all right for them to do with it as they wanted since they transacted all the business after their father's death. He did not think at the time that he had any interest in the property and never previously, until this controversy arose 42 years later, claimed any interest. It is interesting to note that he was asked the following questions and gave the following answers: "Q Did you know that Mr. Feldman claimed he owned it all the time, or not. A Why, yes, until he mortgaged it and gave it over to Mr. Unick. Q But you knew he claimed he owned it all that time. A Yes, sir. Q Well, do you know, if your other brother understood it that same way? A I suppose he did. He never paid no attention to it. * * * Q Now, just a second, here. Now then, did Mr. Feldman ever tell you that he

owned the place? A He claimed he bought it. Q When. A 1903." It is apparent at once then that the witness, defendant, Edward A. Schaub, had actual notice and knowledge that Feldman was in possession at all times asserting that he owned the entire estate, and his claim is therefore barred by virtue of the holding in Keleher v. Kelly, 89 Neb. 127, 130 N. W. 1032, and authorities heretofore cited.

We believe also that Charles had such actual notice and knowledge but, be that as it may, we conclude that the acts and circumstances attending adverse possession were so open, notorious, and unequivocal that notice and knowledge with resulting ouster must be inferred therefrom, not only as to him but as to all other defendants, and that all of their claims were long since barred by the appropriate statute of limitations.

We conclude that the judgment of the trial court was correct and it is affirmed.

AFFIRMED.