In re Charles C. Wells Revocable Trust.
Lee W. Wells, appellee, v. Larry D.
Wells, appellant.

734 N.W.2d 323

Filed June 5, 2007.    No. A-05-849.

Daniel L. Aschwege and Marsha E. Fangmeyer, of Knapp, Fangmeyer, Aschwege, Besse & Marsh, P.C., for appellant.

Patrick J. Nelson, of Jacobsen, Orr, Nelson, Wright & Lindstrom, P.C., for appellee.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Moore, Judge.

## INTRODUCTION

This is an appeal from an order of the county court for Buffalo County removing Larry D. Wells as cotrustee for the Charles C. Wells Revocable Trust and requiring Larry to account to the trust for his actions while holding the position of

cotrustee. On appeal, Larry asserts that the county court erred in removing Larry as cotrustee and in failing to hold that the action for accounting by the other cotrustee, Lee W. Wells, was barred in part by estoppel, laches, and the statute of limitations. Because we find no error in the county court's decision, we affirm the removal of Larry as cotrustee and the order requiring Larry to provide an accounting.

## BACKGROUND

The trust was executed by Charles C. Wells, the father of Larry and Lee, in February 1992. Charles was the sole trustee and income beneficiary of the trust until his death in March 1993. Upon Charles' death, Lee, Larry, and their mother, Irene Wells, became the trust's income beneficiaries and Larry and Lee became cotrustees. Irene passed away in January 2003, leaving Larry and Lee as cotrustees and income beneficiaries. Prior to Charles' death, Larry was a tenant of most of the trust's real property. The trust provides for its termination 15 years after Charles' death or Irene's death, whichever is later, or upon Larry's retirement from active farming after the latter of their deaths. Upon the trust's termination, the real property of the trust is to be divided between Larry and Lee under the terms of the trust agreement. At the time of the trial in this case, Larry was still engaged in active farming of and resided on the trust property.

Lee filed a petition in the county court on July 27, 2004, claiming that Larry had been in possession of residential real property belonging to the trust and had failed to pay rent to the trust or its cotrustees for the use of the property. Lee also alleged that Larry had failed to properly account to Lee for his acts and doings as a cotrustee and a tenant of the farmland and residential property of the trust. Lee alleged that it was impossible for him and Larry to adequately function as cotrustees of the trust. Lee alleged that a conflict of interest arose by virtue of Larry's serving as cotrustee at the same time as he served as a tenant of the property owned by the trust. Lee sought an order from the court removing Larry as cotrustee of the trust and requiring Larry to account for his acts and doings in connection with the affairs and administration of the trust. Lee also sought an order

requiring Larry, as a tenant, to negotiate with the trustees the terms and conditions of the rental agreement or agreements (1) for the year 2004, relating to farmland owned by the trust and farmed by Larry, and (2) relating to residential property owned by the trust and possessed by Larry.

Larry answered, alleging among other things that he and Lee could act as cotrustees and that if anything, Lee should be removed as cotrustee for neglecting the business of the trust. Larry also affirmatively alleged that Lee's action for an accounting was barred by the doctrines of estoppel and laches and the statute of limitations for such actions.

Trial in this case was held on December 17, 2004, and January 25, 2005. We note at the outset that the issue of a rental agreement for the trust farmland for the year 2004 had been resolved prior to trial.

Larry testified about the terms of the trust agreement. When the trust was created in 1992, Charles conveyed certain real and personal property to the trust. The real property originally conveyed to the trust remained in the trust at the time of the December 2004 hearing, but the trust retained none of the originally-conveyed personal property. Upon Charles' death, Larry purchased the trust's personal property, which included machinery, equipment, and livestock, as provided for in the trust. The real estate owned by the trust includes farmland, pasture, a house with a detached garage, certain outbuildings and grain bins, and some Platte River accretion land. Among other things, the trust agreement provided that no part of the trust's property shall be liable for the debts or obligations of any beneficiary, that the trustees may lease the property of the trust to others, and that the trustees may borrow money for any purpose connected with the protection, preservation, or improvement of the trust estate whenever advisable in the trustees' judgment.

Larry testified it was his understanding that he and Lee must act jointly as cotrustees and that neither he nor Lee had the power to do anything separately in connection with the administration of the trust. Larry testified that when Charles died, Larry "treated the trust as [Larry] always treated the trust, as a family unit to be improved and maintained for the benefit of the beneficiaries."

Prior to the creation of the trust, Larry and Charles were partners with respect to both crops and livestock. The partnership utilized the farmland and pasture now owned by the trust. Prior to and after the creation of the trust, Larry and Charles had a crop-share arrangement for the farmland and an equal-division arrangement for the livestock.

In 2003, the farming arrangement shifted to a cash rent lease for both the farmland and the pasture owned by the trust. Larry signed the lease agreements both in his capacity as tenant and in his capacity as cotrustee. Lee also signed as cotrustee. Larry thought that the legal descriptions of real property set forth in the 2003 leases included the land upon which the house, grain bins, outbuildings, and cattle pens are located. Further evidence, particularly a cash rental analysis, indicates that the house, grain bins, outbuildings, and cattle pens were not included in determining the rental value of real property set forth in the 2003 leases. The 2003 leases did not require any additional payments for the use of the house, grain bins, outbuildings, and cattle pens.

Larry has lived in the house on the trust property since 1979. When Larry moved into the house, it was owned by Charles and Irene, and it is now owned by the trust. Larry never paid any rent for the house to Charles or Irene and has never paid any rent to the trust, either while Charles was trustee or since Charles' death. There has never been a lease agreement in place for the house. According to Larry, Charles consented to Larry's residing in the house and having use of the detached garage without payment of rent. Larry has made improvements to the house. Larry testified that his parents were aware of the money and labor Larry and his wife put into remodeling the house. Larry has not provided to Lee any of the underlying bills or contracts relating to the various improvements, but Larry has told Lee about some of those improvements.

When Larry farmed in partnership with Charles, he did not pay Charles any rent for use of the grain bins, cattle pens, or outbuildings on the property. Nor has Larry paid rent to the trust for use of these items. Larry testified that he has placed additional outbuildings and cattle pens and made additions to the grain bins on the property at his own expense. Larry testified

that the house, grain bins, cattle pens, and outbuildings are included in the real property that will be transferred to him upon termination of the trust. Larry testified that he did not feel he should have to pay rent for the house, grain bins, outbuildings, or cattle pens until "such time as [he has] used up the amount of monies that [he] had — and labor that [he] had put into the buildings of [his] own money."

The trust has a single bank account located at the State Bank of Riverdale. Since Charles' death, Larry has received all of the bank statements, canceled checks, and deposit slips in connection with the account. Until March 2003, Larry had possession of the trust's checkbook and wrote almost all of the trust's checks. In March 2003, the signature card at the bank was changed to require the signature of both cotrustees on trust checks. Since that time, all checks drawn on the trust's checking account have been signed by both Larry and Lee. Prior to the change, Larry wrote some checks on the trust account for personal expenses, including a haircut and a personal credit card bill of over $4,000. Those personal expenses were paid by Larry without Lee's knowledge and consent. Larry either reimbursed the trust bank account for those personal expenses or, in one instance, paid for a trust expense with a personal check. Larry testified that he paid for the haircut from the trust account because he simply happened to be carrying the trust checkbook on that particular day. Larry was paid a farm management fee of $5,000 in 1994 and 1995 and of $4,500 in 1996 out of the trust's money without Lee's knowledge or consent.

In April 2004, Larry presented Lee with two checks to sign in connection with the trust for real estate taxes. Larry asked Lee to send the checks to the respective county treasurers for payment of the real estate taxes. Larry became aware that there were insufficient funds in the trust's checking account to cover the two checks, but he did not inform Lee. After the bank called Larry, he deposited personal funds into the trust's checking account to cover the checks. Larry considered the deposit to be part of his rent for 2004. Larry testified that these actions were taken without the knowledge or consent of Lee. Larry agreed that since Charles' death, he had essentially been operating the trust as the

only trustee. Larry did not begin to share copies of tax returns for the trust with Lee until 1996 or 1997. Larry has provided Lee with bank records for the trust's account only "within the last couple of years [before the hearing,] after the lawyers got involved."

Larry testified that since 1993, he has asked Lee on occasion, in his capacity as cotrustee, to join with Larry in borrowing money. Lee has declined to do so on each occasion, telling Larry that he did not believe that it was permitted by the trust agreement. Larry sought legal advice to attempt to persuade Lee that borrowing money on the trust's behalf was appropriate. Larry proceeded to borrow money for the trust on various occasions without Lee's knowledge or consent. A bank employee testified that Lee was asked to sign documents as cotrustee on some of the trust's borrowings, but stated that he "guess[ed]" Lee "just didn't feel like he wanted to sign them." In connection with these prior loans, Larry signed several security agreements in favor of the bank, purporting to act on behalf of the trust and doing so without Lee's knowledge or consent. Larry paid interest to the bank out of the trust's checking account for the loans which he obtained purporting to act on behalf of the trust.

In 2000, Larry sought to have Lee join in the purchase of some cattle by the trust. Lee declined to join in any cattle operation by the trust. Larry proceeded with the purchase and borrowed $26,766.92 on March 8 from the State Bank of Riverdale, purporting to act on behalf of the trust, and wrote a trust check to acquire an interest in the cattle. The purchase was made without the knowledge or consent of Lee.

In August 2003, Larry signed a deed of trust at the request of the State Bank of Riverdale covering real estate owned by the trust, purporting to act on behalf of the trust. Larry did so without Lee's knowledge and consent, and Lee had declined to sign an earlier version of the deed of trust. The deed of trust secured eight promissory notes, all of which were Larry's personal debt, up to a limit of $500,000. Seven promissory notes were still in existence at the time of the December 2004 hearing. At the time the deed of trust was signed, the trust owed no money to the bank. All of the prior loans taken out by Larry purporting to act on behalf of the trust had already been paid.

A bank employee testified that the reason why the bank asked Larry for the deed of trust to the trust property was because the bank was in a "we[a]k collateral position" for Larry's personal obligation with "a loan that [wa]s classified by the regulators." The employee stated that the bank was "trying to get [the loan] off of the classified list and trying to sharpen the bank's collateral" and that "that is the reason for the trust deed." The employee testified that livestock, crops, and equipment were available as collateral for Larry's obligations to the bank, but that neither the bank nor the regulators felt that these were sufficient collateral. The bank filed the trust deed on Larry's "share" of the trust's real property. The bank employee did not have any conversations with Lee about the deed of trust prior to the filing of the deed. Eventually, the employee explained to Lee that the bank was only interested in trust assets that would be Larry's at some point in time. The bank employee testified that he felt Lee was satisfied with this explanation.

Larry provided Lee with very little from an accounting perspective at the beginning of the trust because Larry "was not happy with the type of bookkeeping system" in use. Since about 1996 or 1997, Larry has provided a yearly registry of trust checks along with the income tax documentation of the trust for Lee's review. Larry testified that about a year prior to the hearings in this case, his accountant put together "a complete accounting of the trust at [Lee's] request." A copy of the accounting documentation prepared by Larry's accountant was admitted into evidence as a 70-plus-page document containing an itemization of deposits and checks for the trust account for each year from 1993 through 2003 and reporting beginning balances and ending balances for each year. Larry testified that in terms of the crop-share arrangement with the trust, he had copies of most of the scale tickets or other evidence of crops harvested from the trust's farm ground, together with records showing receipts from the sale of crops, records of various expenses, and canceled personal checks showing reimbursements to the trust account. Larry testified that he understood the trust agreement to require a yearly accounting.

Larry testified that Lee played a very limited role in the operation of the trust as cotrustee, although Lee did sign documents

requiring two signatures. Larry tried to discuss with Lee "important improvements that . . . need[ed] to be done to trust property" but "[n]ever got many answers at all other than it is probably too expensive." Larry testified that he and Lee have shared in the management of the trust's accretion ground. Larry has helped control noxious weeds on that property, while Lee runs a gravel pit operation and has contact with hunters who wish to use the accretion property. Larry testified that Lee has provided him with "[b]its and pieces" by way of an accounting of his acts with regard to the gravel operation. Larry agreed, however, that every gravel royalty check was deposited in the trust's bank account and that he was the sole recipient of statements for the account. Larry testified that after 1999, when he knew Lee disagreed with the trust's borrowing money, he asked the farm finance manager at the bank to bring Lee in to help prepare farm financial statements and balance statements, but that Lee would not attend any of the meetings.

Lee testified that it was not possible for him and Larry to continue to serve as cotrustees of the trust because of "the admitted conflict of interest with [Larry] in the property." Larry did not share Lee's opinion about their being unable to continue to work and serve together as cotrustees. Larry expressed his position that he and Lee could effectively act as cotrustees in managing the trust.

The county court entered an order in this case on June 9, 2005. After setting forth the factual background of the case, the court stated:

> It is axiomatic and pointed out by the parties that this Court, where possible, shall give full deference to the intention of the grantor, Charles . . . , in forming the trust. It is clear to the Court that the overriding intention of Charles . . . was that his two sons, Lee and Larry . . . , should administer the trust jointly for the benefit, first of their mother [Irene] and lastly for themselves. However, it is equally clear to the Court that Larry . . . has, for the most part, acted alone in conducting the business of the trust and has acted, if not improperly, certainly in a manner that appears inappropriate.

First of all, the trust <u>clearly</u> provides that Larry . . . is to pay a reasonable rental for the use of <u>all</u> of the premises, both the pasture ground and the residence. There is no dispute that Larry . . . has <u>never</u> paid any amounts for the use of the residence. It may be, as he alleges, that improvements to the residence have offset some of those amounts but those improvements have been made for his personal benefit and they have not been accounted for. Additionally, the evidence shows that Larry . . . paid himself a farm management fee for several years, the authority for which, is no where [sic] to be found in the four corners of the trust. The evidence reflects that he has paid some personal debts out of trust funds (albeit alleging that he has repaid them) and has also pledged trust real estate to secure personal loans from the State Bank of Riverdale. Interest on some of these loans has been paid out of trust funds, cattle ha[ve] been purchased out of trust funds, and <u>most</u> if not all of the above-noted transactions have been done without the knowledge or consent of his brother and co-trustee Lee . . . .

The explanation for these unilateral actions seems to be an allegation that Lee . . . didn't care or was not interested in the conduct of the businesses of the trust but it is clear from the evidence that no real effort was made to include him in those dealings.

From the evidence presented, therefore, the Court finds [Lee's] position is correct and that Larry . . . should be and is hereby removed as a co-trustee of the Charles C[.] Wells [R]evocable [T]rust and further that he should make a full accounting to Lee . . . of his actions while holding the position of co-trustee. The Court finds that 90 days from the date of this judgment is an appropriate amount of time for said accounting to be provided to Lee . . . .

The county court stated that in accordance with the relevant provision in the trust for naming a successor trustee, Larry and Lee were given a period of 30 days from the date of the court's order to name a successor trustee to the interest of Larry. The court set a hearing date to determine the successor trustee in

the event that the parties could not agree on a successor. Larry subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Larry asserts that the county court erred in (1) removing Larry as cotrustee of the trust and (2) failing to hold that Lee's action for an accounting was barred, in part, by estoppel, laches, and the statute of limitations.

## STANDARD OF REVIEW

■ Appeals involving the administration of a trust are equity matters and are reviewable in an appellate court de novo on the record. *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007).

■ In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Trust of Rosenberg, supra*; *In re Trust Created by Inman*, 269 Neb. 376, 693 N.W.2d 514 (2005). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* In instances when an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *In re Trust of Rosenberg, supra.* An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Id.*

■ The determination of which statute of limitations applies is a question of law that an appellate court must decide independently of the conclusion reached by the trial court. *Brodine v. Blue Cross Blue Shield*, 272 Neb. 713, 724 N.W.2d 321 (2006).

## ANALYSIS

*Applicable Law.*

The Nebraska Uniform Trust Code (NUTC) was enacted in 2003 and became operative on January 1, 2005, between the two evidentiary hearings held in this proceeding. See Neb. Rev. Stat.

§§ 30-3801 to 30-38,110 (Cum. Supp. 2004). This operative date has significance in this case because the NUTC applies to certain preexisting trust relationships. § 30-38,110. See, generally, John M. Gradwohl and William H. Lyons, *Constitutional and Other Issues in the Application of the Nebraska Uniform Trust Code to Preexisting Trusts*, 82 Neb. L. Rev. 312 (2003). Specifically, § 30-38,110(a) provides:

> Except as otherwise provided in the [NUTC], on January 1, 2005:
>
> (1) the [NUTC] applies to all trusts created before, on, or after January 1, 2005;
>
> (2) the [NUTC] applies to all judicial proceedings concerning trusts commenced on or after January 1, 2005;
>
> (3) the [NUTC] applies to judicial proceedings concerning trusts commenced before January 1, 2005, unless the court finds that application of a particular provision of the [NUTC] would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties, in which case the particular provision of the [NUTC] does not apply and the superseded law applies; and
>
> (4) an act done before January 1, 2005, is not affected by the [NUTC].

Under § 30-38,110(a)(1), the NUTC is generally applicable to all trusts in existence on January 1, 2005, subject to certain statutory and perhaps constitutional exceptions. See Gradwohl & Lyons, *supra*. Because this judicial proceeding was commenced prior to the operative date of the NUTC, § 30-38,110(3) requires us to apply the NUTC except in those instances where we determine that such application would "substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties," in which case we must apply prior law which has been superseded by the NUTC. See *In re Trust of Rosenberg, supra*. We find no prejudice to the parties in applying the NUTC in this case.

*Removal of Larry as Cotrustee.*

Larry asserts that the county court erred in removing Larry as cotrustee of the trust. Section 30-3862 provides:

(a) The settlor, a cotrustee, or a beneficiary may request the court to remove a trustee, or a trustee may be removed by the court on its own initiative.

(b) The court may remove a trustee if:

(1) the trustee has committed a serious breach of trust;

(2) lack of cooperation among cotrustees substantially impairs the administration of the trust;

(3) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries; or

(4) there has been a substantial change of circumstances or removal is requested by all of the qualified beneficiaries, the court finds that removal of the trustee best serves the interests of all of the beneficiaries and is not inconsistent with a material purpose of the trust, and a suitable cotrustee or successor trustee is available.

(c) Pending a final decision on a request to remove a trustee, or in lieu of or in addition to removing a trustee, the court may order such appropriate relief under subsection (b) of section 30-3890 as may be necessary to protect the trust property or the interests of the beneficiaries.

The language of § 30-3862 is identical to that of Unif. Trust Code § 706, 7C U.L.A. 575 (2006). The Uniform Trust Code was promulgated in 2000. Given its recent adoption, there is not a great deal of case law discussing the application of § 706; nor is there any Nebraska case law, to date, discussing the merits of a trial court's decision to remove a trustee under § 30-3862. However, the comments to § 706 provide some relevant information for our consideration of the trial court's decision in the present case. With regard to removal of a trustee for a "serious breach of trust," the comment to § 706 provides:

The breach must be "serious." A serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct. A serious breach of trust may also consist of a series of smaller breaches, none of which individually justify removal when considered alone, but which do so when considered together.

7C U.L.A. at 576. With regard to removal for "lack of coopera-
tion among cotrustees," the comment to § 706 provides:

> The lack of cooperation among trustees justifying removal
> under subsection (b)(2) need not involve a breach of trust.
> The key factor is whether the administration of the trust
> is significantly impaired by the trustees' failure to agree.
> Removal is particularly appropriate if the naming of an
> even number of trustees, combined with their failure to
> agree, has resulted in deadlock requiring court resolution.
> The court may remove one or more or all of the trustees.
> If a cotrustee remains in office following the removal,
> under Section 704 appointment of a successor trustee is
> not required.
>
> Subsection (b)(2) deals only with lack of cooperation
> among cotrustees, not with friction between the trustee
> and beneficiaries. Friction between the trustee and bene-
> ficiaries is ordinarily not a basis for removal. However,
> removal might be justified if a communications breakdown
> is caused by the trustee or appears to be incurable.

7C U.L.A. at 576.

Although the county court did not refer to the language of
§ 30-3862 in making its decision that Larry should be removed
as cotrustee, the county court made several factual findings
which would support removal under that statute. The county
court found that Larry has, for the most part, acted alone and
in a seemingly inappropriate manner in conducting the business
of the trust; has failed to pay rent for the use of the house; has
paid personal debts out of the trust; has pledged trust real estate
to secure personal loans; and has made these transactions with-
out the knowledge or consent of Lee, his brother and cotrustee.
We note that the county court did make a couple of erroneous
factual findings—that the trust agreement did not provide for the
payment of a management fee and that Larry paid interest on his
personal loans from the trust bank account.

Larry and Lee are in the unique position of being both
cotrustees and cobeneficiaries. In addition to the findings of the
county court stated above which are supported by the record,
it also appears that there has been very little cooperation or

communication between the cotrustees with regard to the trust business. Larry's and Lee's lack of cooperation and communication with one another has clearly impaired the administration of the trust and has led to the present court action. We conclude that these actions (or inactions), by Larry, when considered together, justify the removal of Larry under § 30-3862(b)(1), (2), and (3). The decision of the county is supported by competent evidence. See *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007) (in absence of equity question, appellate court, reviewing probate matters, examines for error appearing on record made in county court). Larry's assignment of error is without merit.

*Action for Accounting.*

In the petition, Lee sought an order requiring Larry "to account for his acts and doings in connection with the affairs and administration of the Trust, including, without limitation, as a tenant of trust property and as a co-trustee of the Trust." The county court ordered Larry to "make a full accounting to Lee . . . of his actions while holding the position of co-trustee." Larry asserts that the county court erred in failing to hold that Lee's action for an accounting was barred, in part, by estoppel, laches, and the statute of limitations.

Although Larry does not assign error to the order to provide an accounting in general, we do note that Larry has provided Lee with various accounting information over the years. Since 1996 or 1997, Larry has provided a yearly registry of trust checks along with the income tax documentation of the trust for Lee's review. Larry's accountant compiled and provided to Lee an accounting of the trust receipts and expenses from 1993 through 2003. In addition, Larry has provided Lee with copies of various expense documentation over the years.

Larry argues that a 4-year period of limitations should be applied in order to bar any request for an accounting 4 years prior to the institution of Lee's lawsuit. Larry urges the application of either Neb. Rev. Stat. § 25-207 (Reissue 1995) (§ 25-207(3) applies to action for injury to rights of plaintiff, not arising on contract and not thereinafter enumerated) or Neb. Rev. Stat. § 25-212 (Reissue 1995) (actions not specified).

Lee argues that the applicable statute of limitations is the special statute of limitations found in Neb. Rev. Stat. § 30-2818(2) (Reissue 1995). Section 30-2818 was repealed effective January 1, 2005, but it was in effect at the time this case was commenced on July 27, 2004. Section 30-2818(2) provided:

> Unless previously barred by adjudication, consent, or limitation, or subsection (1) of this section, or unless otherwise provided by the instrument creating the trust, any claim against a trustee by a beneficiary for breach of trust or breach of any fiduciary duty arising out of the trust is barred as to any beneficiary who has received an annual or a periodic account or statement fully disclosing the matter subject to the claim *which contains the statement "Claims against the trustee for breach of trust or breach of any fiduciary duty arising out of the trust shall not be made after the expiration of four years from the date the beneficiary receives the annual or periodic account or statement fully disclosing the matter subject to such claim."*, unless a proceeding to assert the claim is commenced within four years after receipt of such account or statement.

(Emphasis supplied.)

The record shows that Lee received certain accounting information from Larry over the years, but there is nothing in the record to show whether the statement necessary to the application of § 30-2818(2) was included in any of the accounting information. Lee argues that § 30-2818(2) does not begin to run until accounting information with the required statement has been provided to the beneficiary. We cannot agree with Lee's assertion. The introductory language of § 30-2818(2) contemplates that by the time a trustee provides an accounting with the requisite statement, the claim might have already been barred by "adjudication, consent, or limitation." In other words, another statute of limitations might be applicable, and if so, any cause of action that was previously barred would remain barred. Thus, we must determine whether another statute of limitations operates to bar any portion of Lee's claim for an accounting.

While we have previously held that an equity action for an accounting is subject to a 4-year statute of limitations, see *American Driver Serv. v. Truck Ins. Exch.*, 10 Neb. App. 318,

631 N.W.2d 140 (2001) (applying § 25-207), we have found no case in Nebraska where a 4-year statute of limitations has been applied to an accounting action in connection with a trust, under either § 25-207 or § 25-212. Prior cases from the Nebraska Supreme Court have recognized the general rule that the statute of limitations is tolled while a trust continues. See, *Dewey v. Dewey*, 163 Neb. 296, 79 N.W.2d 578 (1956) (laches and statute of limitations will generally begin to run between trustee and beneficiary of express or voluntary trust when trust terminates by its own limitations or trustee repudiates trust by assertion of adverse claim to or ownership of trust property); *In re Estate of Statz*, 144 Neb. 154, 12 N.W.2d 829 (1944) (trust of executor or administrator is continuing trust, and he cannot set up statute of limitations as against rights of next of kin or persons entitled to distribution of assets of estate unless they repudiate trust or set up claims in their own rights, or until trust is terminated). See, also, 54 C.J.S. *Limitations of Actions* §§ 21 and 184 (1987) (as general rule, statute of limitations is tolled while trust exists); George Gleason Bogert & George Taylor Bogert, The Law of Trusts and Trustees § 964 (rev. 2d ed. 1983) (unless there is statute expressly governing matter of time within which suit for accounting can be brought, rules with regard to statute of limitations and enforceability of trusts in general apply, and time period will not run against right to account until repudiation and actual or constructive notice thereof).

Although the NUTC was adopted after the institution of this suit, we find certain of its provisions instructive. Section 30-3890(b) provides that a court may order a trustee, among other things, to account or to remedy a breach of trust that has occurred or may occur. Section 30-3894 sets forth a limitation of action against a trustee as follows:

> (a) A beneficiary may not commence a proceeding against a trustee for breach of trust more than one year after the date the beneficiary or a representative· of the beneficiary was sent a report that adequately disclosed the existence of a potential claim for breach of trust and informed the beneficiary of the time allowed for commencing a proceeding.

(b) A report adequately discloses the existence of a potential claim for breach of trust if it provides sufficient information so that the beneficiary or representative knows of the potential claim or should have inquired into its existence.

(c) If subsection (a) of this section does not apply, a judicial proceeding by a beneficiary against a trustee for breach of trust must be commenced within four years after the first to occur of:

(1) the removal, resignation, or death of the trustee;

(2) the termination of the beneficiary's interest in the trust; or

(3) the termination of the trust.

The above statute replaces Neb. Rev. Stat. § 30-2812(2) (Reissue 1995), argued by Lee. We view § 30-3894 as a recognition of the general rule recited above that a cause of action for breach of trust, including a request for an accounting, does not accrue until the termination of the trust, with an exception if a potential claim for breach of trust is disclosed to the beneficiary.

■ Based upon the foregoing, we decline to apply laches or a period of limitations to bar Lee's action for an accounting. We need not address Larry's assertions with respect to estoppel, as he did not present any arguments relating to estoppel in his brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State ex rel. Lemon v. Gale*, 272 Neb. 295, 721 N.W.2d 347 (2006). Larry's assertion that the accounting should be barred, in part, by a period of limitations or the doctrine of laches or estoppel is without merit.

## CONCLUSION

We affirm the decision of the county court removing Larry as cotrustee of the trust and the order requiring Larry to provide an accounting.

AFFIRMED.