GRACE BIDDICK, plaintiff, v. ANNA CATHERINE DRAHOS DARRAGH, appellee, and ANTHONY HOMOLKA, appellant.

No. 48642.

(Reported in 68 N.W.2d 285)

FEBRUARY 8, 1955.

William A. Bergman, of Cedar Rapids, for appellant.

W. L. Fahey, W. G. Cimprich and D. M. Elderkin, all of Cedar Rapids, for defendant-appellee.

OLIVER, J.—This is a phase of a suit to partition Lot 10, Block 35, Carpenters 5th Addition to Cedar Rapids. The parties hereto, Anna Catherine Drahos (now Darragh) and Anthony Homolka, were defendants in the partition suit. Anna is a granddaughter and also the adopted daughter of Anthony and his deceased wife, who died in July 1943. October 1, 1943, Anthony gave Anna a quitclaim deed to his interest in the property, reserving to himself a life estate. His interest was adjudicated to have been an undivided seven-ninths share of the property. After the partition sale but before distribution of the proceeds Anna filed an application or cross-petition against

Anthony for an accounting, claiming $5000 damages for waste on the buildings, wilfully and maliciously committed by him.

The issues raised by this cross-petition and Anthony's answer were tried to the court in equity. During the trial Anna amended the prayer of her petition by asking treble damages. Section 658.1, Code of Iowa, 1954, provides a tenant for life of real property is liable for treble damages for waste thereon committed by him. Section 658.3 states: "Any person whose duty it is to prevent waste, and who fails to use reasonable and ordinary care to avert the same, shall be held to have committed it."

The trial resulted in an adjudication fixing Anthony's liability to Anna for waste at $4666.65. Anthony was credited with $173.29 for repairs and improvements, with $1778.81, for seven ninths of the principal of the mortgage debt paid by him. and with his interest in the property, valued by the court at $1876.73. After these deductions the balance found due from Anthony to Anna was $837.82, for which amount judgment was rendered against him. He has appealed.

At the time of the trial Anthony Homolka was eighty-three years old. He had formerly operated a grocery and meat market. For years after that he did little odd jobs to support himself and his wife. He purchased the lot here in question (apparently for his wife) about the year 1901, for $2300. Upon it were three old houses built about 1850 or 1860. Anthony testified they were not well kept up and were just common little shacks. He moved one of them to one side, repaired it, and lived in it for some years. It was an "oldtimer" without plaster ceilings. The other houses were not moved. They were occupied by tenants. Anthony built a store building on the corner of the lot.

He testified he did the repair work on the buildings before his wife died (in 1943). She did not like to spend the money to keep them in good condition and he made repairs in patchwork fashion from odds and ends. She also owned the adjoining lot upon which there were two old unpainted and roofless barns. The fire marshal ordered these removed. Anthony's wife was

in bad health and he was doing the housework and was unable to tear them down.

When his wife died the gross rentals from the buildings on the lot were $50 per month. The property had been mortgaged some years previously and the amount then owed thereon, about $3500, was due in monthly payments of $45, which included interest. As the life tenant, Anthony was required to pay the interest on the mortgage and the taxes upon the real estate. Moreover, it developed that, as a practical proposition, he was required to make the monthly principal payments on the mortgage, also, to prevent default. He testified: "Well, after my wife died everybody went home, nobody said nothin * * *. My granddaughter [Anna] had no money, my daughter didn't feel like paying it, so * * * I just had to pay it. Had to take it over, keep it up; nobody offered to pay anything."

Following the death of his wife, in July 1943, Anthony proceeded to comply with the order to remove the derelict barns on the adjoining lot. "Afterwards when I seen I was getting only $50 a month out of the rent and paying $45 on the payments I figured I would have to go to work. * * * I got sick in the winter after tearing them barns down * * *." He was then drawing a pension of $20 per month. The next spring he worked in a meat market for a few weeks but again became weak and his doctor directed him to stop working. Thereafter, the only work he did was to make repairs upon the property here involved.

Grace Biddick, plaintiff in the partition suit and a daughter of Anthony, testified concerning the condition of the property at her mother's death:

"Well, before my mother died * * * was during the depression. They had a hard time collecting rent most of the time, or part of the time anyway. And they had no money to go into any—much repair of any kind. Whenever there was any repairs to be done my father did the repairing. I don't ever remember ever seeing a carpenter or a plumber or anything brought in to do any repair work. And my dad did all the repair work that was done. * * * Even plumbing leaks, my dad repaired. * * * Well, I think he did more to repair [after her

death] than my mother did. * * * where we lived, 821 Tenth Avenue, of course the plumbing was always bad there. * * * One time I was visiting there and the plaster fell from the ceiling. * * * And the plumbing was about through, always had been. I remember one time the water run down the side of a wall and my mother turning off the water, and then they did try to repair it. The lavatory was bad, and rather than repair it or fix it she just took the lavatory out and sealed up the pipes. Also where * * * just one electric outlet in the dining room from which we stretched wires in the living room."

She testified the floors "weren't good and they weren't bad. In the bathroom around where the water leaked was bad—rotted." The eaves and spouting around the house were not very good—"I can remember that along that side porch the water always dropped around there. The water was always making puddles."

The property at 1005 Ninth Street "never was taken care of very well, it was always just made to do and that was all. There was no money spent on it. If it needed anything mother made dad just nail it together or do whatever he could; he was no carpenter, he was a butcher."

The roofs of the buildings were in such condition that three new roofs were required the first three years after the death of Anthony's wife. During this period Anthony himself painted the outside of all the buildings. At 821 Tenth Avenue: "Well, I put a new roof on there, painted the whole house, and put new electric wiring in there. We used to use gas—gas lights. When my wife couldn't get the gas mantles any more she put a plug in the dining room and made me stretch wires all over the place. When I rented the house I figured it wasn't very safe, three children and all of those wires running from the basement, so I had—had it wired. * * * The wiring and fixtures [cost] around $125." The new roof cost $275.

He kept up the interiors of the houses for a couple of years, then prices increased but the rents were at depression levels and he was unable to increase them on account of rent controls then in effect. He told the tenants he would do the work if they

would buy the paint and paper but he did not have the money to buy the materials.

When Anthony's wife died the store building was in disrepair. The back room was then rented for living purposes for $17 per month. "Of course they was just common people, they was glad to live there, and they didn't pay any attention to it, it was all right when they were in there, but I couldn't rent it to anybody else, no business of any kind because it was very poor condition." His wife "never tried to do anything for it. * * * The plaster was coming down, floor was gone, had to put new floor in there, and plaster was all peeling, I had to fix that up, I painted it all the way through, cleaned up everything, cleaned up the mess. * * * I was repairing it inside, I put in new floors in there, brand new floors all the way through, new plumbing. * * * It required the same thing, had to be all new." After he had rehabilitated it at a cost of about $1600, he rented it for a tavern at $60 per month.

With reference to a sagging porch on the house at 1005 Ninth Street and its condition prior to the death of his wife, he testified: "Well, to tell the truth there never was any—there never was any foundation under the porch, just a little stone, and it naturally would go down a little bit once in a while. I fixed it up, I raised it myself. * * * I got a jack and raised it up a little and put a little more stone under the corners." After his wife's death he jacked up and repaired the front and side porches at 821 Tenth Avenue. He testified there were no eaves or downspouts left on the houses when his wife died.

Anthony testified he placed the buildings in better condition than before his wife died. "I tried to keep things up and improve them." His accounting, made from his records, in compliance with an order of court, shows he spent more than $3600 for repairs, materials and labor, not including his own labor.

Anna, her husband and a tenant testified the buildings were in good condition when Mrs. Homolka died in 1943. In the language of Anna's husband, "* * * Mrs. Homolka was very particular about how the properties were kept." The circumstances point to the contrary. The houses were old shacks when the Homolkas bought the lot in 1901 and the record indicates

they were substandard at all times thereafter. That Mrs. Homolka permitted the barns on her adjoining lot to remain in such a ruinous condition they were condemned as fire hazards does not accord with the testimony she "was very particular about how the properties were kept." Another circumstance to be considered is the rental value of the properties. When Anthony quitclaimed his interest in the property to Anna (October 1943) the gross rentals were $50 per month. When rent controls were ended in 1951, the gross rentals were $155 per month. Shortly before then Anthony had secured a permit to remodel the large house at 821 Tenth Avenue and install a gas furnace, but did not proceed with the work because Anna told him the properties were to be sold in partition.

The evidence shows that when possession of the houses was taken from Anthony they were not in good repair, measured by the usual standards. However, these houses were substandard. A half century previously they were old shacks and during the forty-two years Mrs. Homolka owned them they had not received proper attention. There is no contention any of the houses became untenantable or was vacant at any time after 1943. The one tenant who testified to their bad condition had continued her occupancy despite an advance in rent and notices to quit served upon her by Anthony. The store building had been partly untenantable until Anthony rehabilitated it at a cost of $1600 and rented it for $60 per month. Mention has already been made of the increase of gross monthly rents of the houses.

The referee in partition sold the houses for $4250, $2250 and $3000 respectively and the store for $5000. The total for the buildings and ground was $14,500. A real-estate agent who purchased the house for $3000, and testified to its bad condition, admitted he had resold it for $3200 without redecorating it. This furnishes some indication of the general nature of the property.

The findings of fact state: "After the hearing had been partially completed the applicant announced that she was not now claiming there had been any waste as to 1001 Ninth Street Southeast [the store building]." Of course, she had the right to withdraw this part of her claim. However, the store build-

ing was a part of the property in question and evidence of its condition, improvement, rentals, etc., was relevant.

The court found the loss for failure to repair was $2000 and the loss to Anna's seven-ninths interest was $1555.55. This figure was tripled, resulting in an allowance to Anna of $4666.65. However, the court found Anthony was entitled to certain credits (not tripled) for repairs made by him. "Seven ninths of $90 (new roof on 825 Tenth Avenue) minus depreciation at eight percent for six years, equals $36.40. Seven ninths of $400 ($275 plus $125 for roof and wiring on 821 Tenth Avenue) minus depreciation at eight percent for seven years, equals $136.89." (Nothing was allowed Anthony for the $1600 expended by him in rehabilitating the store building, perhaps because Anna had withdrawn her claim for waste upon that building.)

From the foregoing it appears there were findings of non-compliance by Anthony of his duty to repair, in some particulars, and in other particulars, of overcompliance which entitled him to an allowance. Under the circumstances of this case such findings do not seem consistent. See Shelangowski v. Schrack, 162 Iowa 176, 181, 143 N.W. 1081.

Holzhauser v. Iowa State Tax Commission, 245 Iowa 525, 532, 62 N.W.2d 229, 233, points out: "A life tenant of real estate is required to pay the ordinary taxes, the interest on special assessments and on mortgages on the real estate. It is also his duty to keep the place in repair from ordinary wear and tear."

In re Estate of Dolch, 237 Iowa 1065, 1067, 24 N.W.2d 447, 448, states: "* * * such ordinary repairs as are necessary to preserve the improvements and prevent waste due to their falling into a state of dilapidation should be made by the life tenant at his own expense, so that, as nearly as practicable, the property may pass to the remaindermen unimpaired."

Restatement of the Law, Property, section 139, states: Subject to certain exceptions the owner of an estate for life "has a duty to preserve the land and structures in a reasonable state of repair, to the extent that the issues, profits, rent and income, with which such owner is chargeable, exceed the sum

theretofore properly expended by him in the payment of other carrying costs of the estate and are sufficient to permit the payment of the cost of such preservation."

Upon this proposition Tiedeman on Real Property, section 66, elaborates: "He will not, however, be forced to expend any very large sums of money, where there has been any extraordinary decay or destruction of the buildings. And if the buildings were in a state of decay at the time when his term began, he will not be called upon to repair."

In the language of Walsh, Commentaries on Law of Real Property, section 87, page 573: "He is not required to make good dilapidations existing when his life estate was created." Savings Investment & Trust Co. v. Little, 135 N. J. Eq. 546, 39 A.2d 392, 395, 396, applies that doctrine. See also 31 C. J. S., Estates, section 44; 33 Am. Jur., Life Estates, Remainders, etc., section 448.

In the case at bar, the houses were not in good condition in 1943 and had not been for many years. The store building needed major repairs and replacements. Anthony was not required to place the buildings in a better condition than they then were. Considering them together, the record does not show they were more in disrepair in 1951 than in 1943 or that the changes in their condition decreased their sale value. It is our conclusion the evidence does not show waste upon the property during that period.

Anthony complains also the commutation of his life estate was not made on a proper basis. The record is inadequate to permit consideration of this complaint.

That part of the judgment based upon the findings allowing Anna $4666.65 for waste and allowing Anthony credits of $36.40 and $136.89 is reversed and said items are disallowed. Otherwise the judgment is affirmed. The cause is remanded for the entry of judgment accordingly. Costs in this court are taxed to appellee.—Reversed in part, affirmed in part and remanded.

All JUSTICES concur.