CARRY A. DEWEY, A WIDOWER, ET AL., APPELLANTS, V. IVAN DEWEY ET AL., APPELLEES, IMPLEADED WITH EDWIN E. DEWEY ET AL., APPELLANTS.
79 N. W. 2d 578

Filed December 7, 1956. No. 33959.

*Hines & Hines* and *Jack H. Hendrix*, for appellants.

*Russell & Colfer*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

This action was originally brought by plaintiffs, Carry A. Dewey, a widower, Dora V. Scott, a widow, and William F. Dewey and Fanny Dewey, his wife, seeking to require defendants, Ivan Dewey and Nila Dewey, his wife, to comply with certain contracts hereinafter discussed and reconvey to plaintiffs their alleged respective undivided shares in a described 480-acre farm in Hitchcock County, subject to a duly recorded mortgage of the Federal Land Bank of Omaha. Other named parties allegedly claiming an interest in the land as owners of undivided shares were also made defendants. They will be hereinafter designated as codefendants or

by name. Plaintiffs prayed for a determination of the interest of the various claimants; for a proportionate allocation or partition of the land; for an accounting of rents and profits; and for general equitable relief.

Ivan Dewey and Nila Dewey, hereinafter called defendants, filed an answer and cross-petition admitting the execution of contracts relied upon by plaintiffs and codefendants but denying generally and factually alleging repudiation by defendants in 1937 of the voluntary trust created by such contracts, which facts were known or could have been discovered by reasonable diligence and barred plaintiffs' and codefendants' right of recovery by reason of laches, adverse possession, and the statute of limitations. Defendants prayed for dismissal of plaintiffs' petition and rendition of a decree quieting title to the land in them.

Plaintiffs' answer and reply was a general denial. Subsequently certain codefendants who were heirs of Eliza Fleming, deceased, answered, admitting the allegations of plaintiffs' petition but denying the allegations of defendants' answer and cross-petition and claiming a one twenty-fourth interest in the land. In the meantime, plaintiff Carry A. Dewey having died, the action was revived in the names of his heirs-at-law and the administrator of his estate.

Subsequently an amended answer and cross-petition was filed by defendants, which included some omitted allegations but concededly did not change the cause of action, and it was stipulated that the answers originally filed should apply thereto. At pretrial, it was also stipulated that abstracts of title to the land and the contracts involved might be admitted without foundation; that the burden of proof was upon defendants; that the first issue to be determined was their rights by reason of defendants' claim of adverse possession and statute of limitations; and that no evidence of accounting should be offered until such issues had been fully determined.

Thereafter, upon application, a guardian ad litem was

appointed for codefendant Clem S. Fleming, husband of Eliza Fleming, deceased, and he answered, admitting the allegations of plaintiffs' petition; denying the allegations of defendants' cross-petition; and praying for a decree finding and adjudging that he, together with his named codefendant children, owned a one twenty-fourth interest in the land. In that connection, it was stipulated that Clem S. Fleming was committed to Hastings State Hospital April 14, 1951, and that all other parties were competent and under no disability. However, there was no competent evidence, and there is no contention here, that Clem S. Fleming was mentally incompetent within the statutory period of limitations if applicable, and his guardian ad litem did not appeal.

Thereafter, codefendants Edwin E. Dewey and Iva Dewey, his wife, who had by warranty deed dated January 21, 1928, and duly recorded January 28, 1928, transferred all of their undivided interest in the land to Timothy G. Dewey for a recited consideration of $1,200, filed an answer. Therein they admitted the allegations of plaintiffs' petition, denied the allegations of defendants' cross-petition, and alleged that their deed aforesaid was obtained by fraud and without consideration. They joined in the prayer of plaintiffs' petition and prayed that Edwin E. Dewey should be found to be the owner of a one-sixth interest in the land. Plaintiffs then filed an amended answer and reply to defendants' answer and cross-petition, alleging among other things improvements by defendants in lieu of rentals and an existing confidential relationship.

After trial by the court upon the issues thus presented, a judgment was rendered finding and adjudging in effect that plaintiffs' and codefendants' rights of action were barred by the statute of limitations and laches; and that defendant Ivan Dewey had acquired the entire title to the land by adverse possession. The judgment quieted title thereto in him.

Motions for new trial were overruled, whereupon

plaintiffs and codefendants Edwin E. Dewey and Iva Dewey, his wife, Alice M. Brott and Willis Brott, her husband, Susan R. Eskew and Virgil M. Eskew, her husband, Gladys Thumser and Edward Thumser, her husband, and Neva Myers and Arvene Myers, her husband, who appear herein as sole appellants, appealed to this court, assigning that the judgment was not sustained by the evidence and was contrary to law. We conclude that the assignment should not be sustained.

The relevant and material evidence is not in dispute. As shown by abstracts of title and other relevant evidence, it was agreed that the record title to the land at the time of execution of the contracts involved herein was as follows: Ivan Dewey, one-fourth; Carry A. Dewey, one-sixth; William F. Dewey, one-sixth; Dora V. Scott, one-sixth; Estate of Eliza Fleming, one twenty-fourth; George Dewey, one-eighth; and Timothy G. Dewey, one-twelfth, all in trust to William F. Dewey. Beginning in 1922, although William F. Dewey was trustee, the land was thereafter concededly managed and rentals therefrom were collected by Timothy G. Dewey until 1937. Defendant Ivan Dewey became a tenant on the land in 1929 and as such paid rentals therefor to Timothy G. Dewey, his father, until the year 1937.

On or about November 4, 1933, the land had become encumbered by mortgages and tax liens in the sum of about $3,500. Being desirous of expediting and obtaining a loan from the Federal Land Bank of Omaha or elsewhere in order to pay such encumbrances, it was orally agreed by the parties, including William F. Dewey as trustee, that the shares of all the other joint owners in the land should be deeded to defendant Ivan Dewey so that he would possess the full title for that purpose. That was done by warranty deeds duly executed, delivered, and recorded. In that connection, on January 17, 1934, defendants duly signed, acknowledged, and delivered a written agreement made with the then other joint owners which provided in part: "AND WHEREAS,

the said owners of said property have agreed to convey said property to the said Ivan Dewey, so that he can make application for said loan, and obtain the same, and pay off the present liens against said property from the proceeds of said loan:

"NOW THEREFORE, in consideration of such conveyance, the said Ivan Dewey hereby agrees that he will make application for said loan, and obtain the same as soon as the same can be done, and that *as soon as said loan is completed,* that he will reconvey to the other parties above named, subject to such mortgage or mortgages as it may be necessary for him to give to obtain such loan, an undivided seven-eights interest in the said property; that no liens of any kind will be given by him on said property except such as will be necessary to obtain sufficient funds to pay off the present liens against said property; that in the event he is unable to obtain a loan of sufficient amount to discharge such liens as are now on said property, that he will reconvey said premises to the parties as above mentioned, subject to the present liens against the premises, and the accrued interest and taxes thereon." (Italics supplied.) A copy thereof was also executed on September 15, 1934, because another party wanted one. It will be noted that on January 17, 1934, the parties were confused with regard to the extent of their respective shares in the land, but that is of no consequence here.

Thereafter, on July 16, 1934, defendants obtained a mortgage loan on the land from the Federal Land Bank of Omaha, for $3,500 at 4 percent, due and payable in 72 semi-annual installments beginning March 1, 1935. Timothy G. Dewey and an attorney agreeably handled the entire transaction, including payment of the encumbrances then on the land out of the loan. Although the agreement of January 17, 1934, provided that defendants should reconvey the land "as soon as said loan is completed," plaintiffs on cross-examination adduced some evidence of an oral agreement made by defendants with

Timothy G. Dewey in the presence of George Dewey sometime after the deeds were delivered to defendants that the land was to be owned solely by defendants after 3 years from January 17, 1934, unless in the meantime defendants had been paid back the money they had invested therein. Be that as it may, from 1934 to 1937, the land was dry, blowing, and worth only about $4,000, and defendants in possession did not reconvey but paid rentals to Timothy G. Dewey until 1937. For that year and continuously thereafter, defendants, being in exclusive possession and openly claiming to be sole owners, made the land their home, paid no rentals, paid all the taxes together with accrued principal and interest on the mortgage, took all the income and profits, kept up the improvements, subsequently improved the land beyond that ordinarily proper for full enjoyment and use thereof, and contracted of record with regard to the land in every manner in their own names as sole owners.

In that respect, on January 17, 1934, the improvements were located in the southwest corner of Section 12 on a side hill south of a creek. They consisted of a small, old dwelling house, having no foundation, unpainted, and in poor repair; an old barn, having no foundation, unpainted, and in poor repair; an old granary, having no foundation, unpainted, and in poor repair; a hen house, in fair condition, but unpainted; a well and windmill, with an old wooden tower; and fences in poor repair, having rotten posts and wires.

Beginning in March or April, 1937, believing and claiming that they were sole owners of the land, defendants moved some of the improvements and began construction of new improvements in a different location north of the creek in the northwest corner of Section 12. There, beginning in 1937, they constructed a new four-room dwelling house, costing $2,000, put down a new well, and improved the yard by constructing a wall and fence and setting out trees. In 1939 defendants rebuilt the fences, enclosing the land with creosote posts

and wire at a cost of $300. In 1942 they built an addition on the house costing $500. In 1943 they built a new granary costing $220. In 1944 they built a brooder house costing $220, and a barn costing $1,000. In 1948 they built a combined garage and wash house, costing $2,000, and installed electricity in the house, costing $225. In 1951 they installed a power water system, costing $733, and wired the out buildings for electricity, costing $194. In 1952 they built another addition on the house, costing $4,500, and in 1953 they installed electric wiring therein, costing about $133. In the meantime, defendants kept all improvements in repair and insured them at their own expense in their own names as owners from and after 1937. Commencing in 1938, the land was farmed by defendants under the government soil conservation program in defendants' names as owners, and defendants were paid the benefits thereof as owners. They contoured the land, of which 211 acres were tillable, stopped its blowing, and greatly improved it for crop raising. They made all accruing principal and interest payments on the Federal Land Bank mortgage, and paid all taxes for all years after 1936. In 1938 and 1941, as owners, they leased the land for oil and gas, which leases were duly recorded, and they kept the rentals received therefrom.

Concededly, defendants never did give the interested plaintiffs and codefendants actual formal notice that they claimed title to the land or had repudiated the trust, but defendants were not required to do so because, contrary to plaintiffs' and codefendants' contention, they and their predecessors at all times had notice and knowledge of defendants' repudiation from all the attending open, notorious, and unequivocal facts and circumstances heretofore recited. Concededly, they had severally visited defendants on the land upon numerous occasions between 1937 and September 1953. They then and there saw the improvements and knew that defendants were paying no rentals and were taking the income and

profits, but they made no demand for an accounting thereof. They knew that defendants were contracting with regard to the land as owners and were making the great expenditures for improvements and otherwise aforesaid, to wit, in an amount more than three times as much as the land was worth between 1934 and 1937. However, they never reimbursed or offered to reimburse defendants for any of them, and none of plaintiffs or codefendants or their predecessors ever claimed any interest whatever in the land or made any demand whatever for any accounting or reconveyance until early in September 1953, some 19 years after 1934, and some 16 years after 1937, at a time when the land as improved by defendants was concededly worth $25,000 to $30,000.

In that connection, sometime after the first part of September 1953, Edwin E. Dewey, who had already conveyed his interest in the land to Timothy G. Dewey in 1928, and who did not participate in or take any part in the transaction when the land was conveyed to defendants, was the first person since 1934 who ever made any claim to any interest whatever in the land or requested reconveyance, which defendants refused to do. After such undue and unexplained delay and change in the condition and relations of the property and parties, this action was filed September 14, 1953.

This court has held that: "The accrual of a cause of action means the right to maintain and institute a suit, and whenever one person may sue another, a cause of action has accrued and the statute begins to run, but not until that time. So whether at law or in equity, the cause of action arises when, and only when, the aggrieved party has a right to apply to the proper tribunal for relief." Bend v. Marsh, 145 Neb. 780, 18 N. W. 2d 106.

A rule applicable here is that laches and the statute of limitations will generally begin to run between a trustee and beneficiary of an express or voluntary trust

when the trust terminates by its own limitations or the trustee repudiates the trust by the assertion of an adverse claim to or ownership of the trust property.

Such repudiation may be proved either by actual knowledge or notice thereof, or by open, notorious, and unequivocal facts and circumstances from which a beneficiary who is not under any recognized disability would be put on notice that the trust has been repudiated and require him to timely assert his equitable rights. In that respect, whether or not such facts and circumstances are consistent with continuance of the trust or indicate an intent to repudiate and claim adversely is a question of fact for determination by the court in each individual case. Reed v. Fairmont Creamery Co., 37 F. 2d 332; Bend v. Marsh, *supra;* Stianson v. Stianson, 40 So. Dak. 322, 167 N. W. 237, 6 A. L. R. 280; Bogert, The Law of Trusts and Trustees, Vol. 4, Pt. 2, § 951, pp. 202, 206, and 207; 54 C. J. S., Limitations of Actions, § 182b, pp. 169, 171, and 173; 90 C. J. S., Trusts, § 456, p. 881; 1 Am. Jur., Adverse Possession, § 72, p. 835.

With reference to "Laches of the Beneficiary," it is said in Restatement, Trusts, § 219, p. 627: "(1) The beneficiary cannot hold the trustee liable for a breach of trust if he fails to sue the trustee for the breach of trust for so long a time and under such circumstances that it would be inequitable to permit him to hold the trustee liable.

"(2) The beneficiary is not barred merely by lapse of time from enforcing the trust, but if the trustee repudiates the trust to the knowledge of the beneficiary, the beneficiary may be barred by laches from enforcing the trust." In comment on Subsection (1) a, the factors to be considered in determining whether or not the beneficiary of a trust is precluded by laches from holding the trustee liable for breach of trust are set forth at length. They need no repetition here. As stated in Comment on Subsection (1) b: "The length of time necessary to bar the beneficiary from holding the trustee

liable for breach of trust depends upon the circumstances. In the absence of special circumstances the beneficiary is barred if the period of the Statute of Limitations applicable to actions at law in analogous situations has run."

Also, as stated in Comment on Subsection (2) g: "Although the beneficiary may be barred by laches from holding the trustee liable for breach of trust, he does not lose his interest in the trust property merely because of the lapse of time, however great; if, however, the trustee has repudiated the trust to the knowledge of the beneficiary and the beneficiary fails to bring suit, he may be barred by laches from enforcing the trust. Such repudiation need not be in specific words; it may consist of conduct on the part of the trustee inconsistent with the existence of the trust." See, also, Restatement, Trusts, Nebraska Annotations, § 219, p. 111, too numerous to cite here.

As held in Bend v. Marsh, *supra*: "Independently of any limitation for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done in the particular case by granting the relief asked." In that opinion, it is said: " 'Laches does not grow out of the mere passage of time. It is founded upon the inequity of enforcing a claim where there has been a change in the condition or relations of the property or parties.' Platte Valley Bank v. Lemke, 141 Neb. 218, 3 N. W. 2d 396. See In re Guardianship of Protsman, 136 Neb. 192, 285 N. W. 494."

It is also true that: "The defense of laches prevails only when it has become inequitable to enforce the claimant's right, and is not available to one who has caused or contributed to the cause of delay or to one who has had it within his power to terminate the action." Bors v. McGowan, 159 Neb. 790, 68 N. W. 2d 596. However, defendants herein did not cause the delay in

bringing this action by any acts or conduct, concealment or misrepresentation by them, and contrary to the contention of plaintiffs and codefendants, the latter part of such rule does not bar the application of laches.

Further, plaintiffs and codefendants argued that they were tenants in common with an existing blood relationship to defendants, which, being confidential in character, precluded defendants from taking advantage of them without their actual notice, knowledge, or consent. The contention has no merit. No authority is cited or found which sustains that contention under facts and circumstances comparable with those presented herein.

In Unick v. Saint Joseph Loan & Trust Co., 146 Neb. 789, 21 N. W. 2d 752, where comparable contentions were made, this court, citing and distinguishing several authorities from this jurisdiction, held: "An ouster, in the law of tenancy in common, is defined as the wrongful dispossession or exclusion by one tenant in common of his cotenant or cotenants from the common property of which they are entitled to possession.

"The possession of real property by a tenant in common is ordinarily the possession of all cotenants and before their ouster arises notice or knowledge of acts causing their ouster must be brought home to them in some plain and unequivocal manner.

"The notice or knowledge out of which ouster of cotenants arises need not be actual but may be constructively inferred from acts and circumstances attending adverse possession which are open, notorious, and unequivocal in their character and import, and where notice or knowledge, actual or constructive, is shown, the ignorance or mistake of cotenants as to their rights will not affect the operation of the statute of limitations in the absence of fraudulent concealment or misrepresentation.

"Where one tenant in common enters upon the whole estate, substantially improves it beyond that ordinarily

proper for the full enjoyment or use of the estate as a tenant in common, takes all the rents and profits, pays all the taxes, makes it his home and openly claims the whole for more than the period of the statute of limitations, an ouster of his cotenants will be presumed although not otherwise proved.

"Statutes of limitations governing actions to recover land, as applied to ousted cotenants, begin to run from the time of such ouster, and, if action is not brought within the statutory period, operate both to bar recovery of the land and to vest title in the disseizor." Such rules refute the contention of plaintiffs and codefendants.

We conclude that plaintiffs and codefendants were barred from any recovery by the statute of limitations and laches and that the judgment of the trial court was correct. It should be and hereby is affirmed. All costs in this court are taxed to named appellants.

AFFIRMED.