Wm. F. HODNY and Doris L. Hodny, Plaintiffs-Appellants,

v.

Comfort L. HOYT et al., Defendants-Appellees,

v.

The Answering Defendants, Richard M. HOYT, et al., Third-Party Plaintiffs and Answering Defendants,

v.

GRAND LODGE OF the KNIGHTS OF PYTHIAS, DOMAIN OF NORTH DAKOTA, Third-Party Defendant and Appellant.

No. 9193.

Supreme Court of North Dakota.

June 11, 1976.

C. J. Schauss, Mandan, for plaintiffs-appellants.

Sperry & Schultz by Alfred C. Schultz, Bismarck, McCrady, Kreimer, Ravick & Bonistalli by Joseph J. Bonistalli, Pittsburgh, Pa., for defendants-appellees.

SAND, Judge.

This is an appeal from the judgment of the Morton County District Court refusing to quiet title in William and Doris Hodny to certain land in Morton County in accordance with their petition and holding that the heirs of Abbie Hoyt were entitled to possession of the land in question.

The land over which this dispute arose is described as the Southwest Quarter of Section Four, in Township One Hundred Thirty-eight North, Range Eighty-one West of the Fifth Principal Meridian, in Morton County, North Dakota.

On November 5, 1924, the owner of this land, Comfort L. Hoyt, transferred the land by trust deed to A. W. Patterson, John L. Bowers, and George F. Wilson, as Trustees. Under the terms of the trust, the trustees were to hold the land for Mandan Lodge No. 14, Knights of Pythias of the Domain of North Dakota for ten years. After the expiration of ten years the land was to be deeded to the Mandan Lodge, if the Lodge was still in existence. The land was to be conveyed to the Grand Lodge prior to the expiration of the ten-year period if the Grand Lodge of the Knights of Pythias of the Domain of North Dakota constructed a "Pythian Home" on the land or on another suitable location near Mandan. The trust also provided that any income from the land be held in trust for the Mandan Lodge or the Grand Lodge.

In the event the Mandan Lodge ceased to exist before the ten years expired and the Grand Lodge had failed to construct the Home in that time, the land was to be conveyed by the trustees to Annie S. Hoyt and Abbie Hoyt, if living, and if not, to John S. Hoyt and his heirs.

It is undisputed that the Grand Lodge did not construct a Pythian Home. However, the question of whether the Mandan Lodge was in existence in 1934 is in dispute. The trustees did not convey the land at the end of ten years (1934) to the Mandan Lodge or to Annie or Abbie Hoyt. The land was rented out in 1926, and continued to be rented out after 1934. The rent money was paid to the trustees and placed in an envelope marked "Trustee for the Knights of Pythias."

All of the original trustees named in the trust deed are now deceased. Albert Patterson died in 1933, George Wilson in 1934, and John Bowers in 1955.

Comfort L. Hoyt died September 17, 1925. His estate was probated in Morton County and a decree was issued transferring his property to Annie and Abbie Hoyt. The property under consideration in this action was not mentioned in that decree. Annie Hoyt died in 1933, leaving Abbie Hoyt as her sole heir. Abbie made no claim

to the land in 1934 or at any time thereafter. Abbie Hoyt died in 1963. She left a will with a residuary clause under which her property would pass to her heirs, the defendants in this case.

From 1926 until his death in 1969, Ed Pulkrabek rented the land. Pulkrabek paid the rent to the trustee John Bowers, until Bowers' death in 1955. After that the rent was paid to Bowers' attorney, who deposited the money in the bank to the account of J. L. Bowers, Trustee for the Knights of Pythias.

In 1960 or 1961, Pulkrabek sublet the land to Francis J. Kahl. Kahl, believing Pulkrabek to be the owner of the land, paid the rent to him. Following Pulkrabek's death, Kahl, being uncertain as to whom he should pay the rent, asked his attorney and the State's Attorney what he should do. He was advised to have the land put on the tax rolls, which he did in 1970. Prior to that time no taxes had been levied on the land. He also started a search for the heirs of Comfort Hoyt.

In 1973, William Hodny made inquiries regarding the purchase of the land from the Knights of Pythias. On August 6, 1973, three trustees were appointed by the district court as successors to the trustees initially named. On October 10, 1973, a special warranty deed was executed by the trustees conveying the property in question to the Grand Lodge of the Knights of Pythias, which later conveyed it by a quitclaim deed to Hodny for the sum of $16,000. Hodny also paid the back taxes for 1970, 1971, and 1972. The record does not disclose a tax deed having been issued to Hodny, and neither does he claim to have received one.

Hodny, after acquiring the quitclaim deed, informed Francis Kahl that he was the owner of the land and proceeded to fence that side of the land which abutted on a section of Kahl's own land. Kahl refused to acknowledge Hodny's ownership of the land and removed sections of the fence.

Hodny and his wife then brought an action to quiet title to the land in himself and his wife, naming as defendants Comfort L. Hoyt, Annie S. Hoyt, Abbie Hoyt, John S. Hoyt, and all persons unknown claiming under one of the decedents. Following the commencement of this action, Francis J. Kahl interposed an answer. Hodny moved for and was granted summary judgment against Kahl. Richard M. Hoyt, John A. Hoyt, Catherine Sellers, Michaela F. Junge, Eleanor G. Kistler, and Lorraine H. Kelly then petitioned the court for leave to intervene and were made defendants in the action. A default judgment was granted against the original defendants in the action. The later defendants, Richard M. Hoyt, et al., were excepted from this judgment and continued the suit in the district court.

Francis Kahl appealed from the summary judgment granted in favor of the Hodnys. Richard A. Hoyt, et al., appealed from the judgment rendered against Comfort L. Hoyt, et al. The North Dakota Supreme Court held the judgments were not appealable because of failure to conform with the requirements of Rule 54(b), North Dakota Rules of Civil Procedure. *Hodny v. Hoyt,* 224 N.W.2d 826 (N.D.1974).

The trial from which this appeal was taken was then held, which resulted in a judgment for Richard A. Hoyt, et al., on August 20, 1975. Hodny now appeals from this judgment, claiming that the finding of fact by the trial court that the Knights of Pythias Lodge of Mandan was not in existence in 1934 was clearly erroneous and that the court erred by holding that there was no repudiation of the trust by the trustees insofar as it related to the Hoyt heirs. Hodny also claims that the court erred in holding that the statute of limitations did not bar action by the Hoyt heirs, that the Marketable Record Title Act did not bar the Hoyt heirs, that laches did not bar the claims of the Hoyt heirs, and that the plaintiffs have no estate or ownership in the property.

At the heart of the controversy is the question of whether Mandan Lodge No. 14 of the Knights of Pythias existed on November 5, 1934, the date on which the land was to be conveyed either to the Lodge or

to the Hoyts, depending on the situation. The Hoyt heirs, as third-party plaintiffs and answering defendants, contend that this is the only issue in the case, and that if the Mandan Lodge ceased to exist prior to November 5, 1934, the appellant, Hodny, had no claim whatsoever to the property. Hodny, however, claims that the existence of the Lodge in 1934 is not essential to his claim, and that there are other theories, such as repudiation of trust, adverse possession, laches, and chain of title under which he is entitled to the property.

The trial court found as a fact that Mandan Lodge No. 14 of the Knights of Pythias was not in existence in 1934. Under Rule 52(a), North Dakota Rules of Civil Procedure, this court will not set aside the trial court's finding of fact unless it is found to be clearly erroneous.

A review of the evidence presented at the trial shows the following:

The record of the Grand Lodge (State) of North Dakota was put into evidence at the trial. The report on the Mandan Lodge showed that on December 31, 1930, the Lodge had 88 members and that on December 31, 1931, the 88 members had been suspended, presumably for failure to pay dues, and the record shows no members in the Lodge. The report also showed that Lodge No. 14 had no assets as of December 31, 1931.

The Grand Lodge had no record of any meetings of the Mandan Lodge or of any activities of the Lodge after 1931. No testimony was presented from any past members or other witnesses as to whether the Lodge continued to function after 1931.

Charles Cooley, the attorney who handled John Bowers' estate and continued collecting the rents from the trust account after Bowers' death, stated that he believed the Lodge had ceased to exist prior to 1934.

Hodny admits that the Lodge membership was at zero in 1931, but contends that the Lodge was never officially dissolved. There is no record of any action by the Grand Lodge to suspend the Mandan Lodge, although the bylaws of the club provide for notice and hearing before any Lodge could be suspended.

Norman Berg, the current Grand Secretary of the State Lodge, testified that a Lodge could continue to function even though its members are delinquent in their dues and that the payment could be waived.

A clipping from the *Mandan Pioneer* from December 29, 1934, was introduced. The article stated that a New Year's Eve party was to be held at the Knights of Pythias ballroom on December 31, 1934.

William Russell testified that on that evening he attended the party in the Knights of Pythias Hall. He testified that there were high-backed chairs at the officers' stations and a Lodge flag with a "K. P. emblem."

George Toman also testified that he attended functions at the Knights of Pythias Hall from 1930 to 1934 and that he also saw high-backed chairs which had a K. P. emblem on them.

The fact that the Hall once occupied by the Knights of Pythias continued to be called the Knights of Pythias Hall, or that Lodge furniture remained there, is not conclusive as to the issue of whether the Lodge continued to function as a Lodge.

The fact remains that under the terms of the trust the trustees were required to transfer the land to Mandan Lodge No. 14 if it was in existence in 1934. No transfer was made. The most likely conclusion to be drawn from this is that the Mandan Lodge was not in existence on that date.

A trustee is presumed to act in good faith. At least one of the trustees, John Bowers, had been a member of the Lodge. Bowers also had an abstract business. He surely would have known if the Lodge was in existence in 1934 and, acting in good faith, would have transferred the land to the Lodge.

After 1934, Bowers continued to collect the rent for the land and to hold it (the rent money) in trust for the Knights of Pythias. This money was never transferred to the Mandan Lodge, presumably because the Lodge had ceased to exist.

In 1973, when the new trustees were appointed, the land was deeded to the Grand Lodge, rather than Mandan Lodge No. 14; although under the terms of the trust the Grand Lodge was not entitled to it because a Home had not been built as provided for in the trust. This is indicative that the Mandan Lodge had ceased to exist as either a functioning entity or a paper entity.

We cannot and do not find from the evidence presented that the finding of fact of the trial court that Mandan Lodge No. 14 was not in existence in 1934 was clearly erroneous.

Appellant Hodny also contends that even if it is found that the Mandan Lodge was not in existence in 1934, he still has a good title through the Grand Lodge of the Knights of Pythias. Hodny claims that Bowers, by failing to transfer the land to Abbie Hoyt in 1934, repudiated the trust and has been holding adversely to the Hoyts since that time. The argument is that Bowers held the land for the Knights of Pythias, as evidenced by the fact that he continued to collect the rent as trustee for the Knights, and that therefore the holding was adverse to the Hoyts. Hodny claims that the Hoyts are now barred by the statute of limitations from claiming this land.

The general rule where there is a claimed repudiation of a trust is that so long as there has been no denial or repudiation of the trust the possession of the trustee of an express and continuing trust is presumed to be that of the cestui que trust and the statute of limitations does not run between them. 34 Am.Jur., Limitation of Actions, § 107, p. 86; 54 A.L.R.2d 21; Bogert, Trusts and Trustees (2d ed.) § 951, p. 472.

The trustee must show a plain, strong, and unequivocal renunciation. The only way in which the trustee of an express trust can set the statute of limitations in operation in his favor is by a distinct act of repudiation amounting to a denial of its existence, and no mere tacit failure of the trustee to perform his duty should be held to amount to a repudiation. 76 Am.Jur.2d, Trusts, § 591, p. 798.

Generally, for a trustee's repudiation of an express trust to be sufficient to set the statute in motion in his favor against the beneficiary, the beneficiary must have notice of the repudiation.

A trustee may sufficiently repudiate an express trust, not only by means of a repudiative statement or other communication, but by acts plainly evincing his repudiation of the trust status, where his repudiative conduct is such as to put the beneficiary on notice of his adverse position in the matter. 54 A.L.R.2d 28.

Hodny also contends that the trustee in 1934 or thereafter actually held the property in trust for the Grand Lodge of the Knights of Pythias, and that as such an implied trust was created pursuant to the provisions of § 59–01–06, North Dakota Century Code. However, it must be noted that the trustee holding under an implied trust pursuant to § 59–01–06 holds it for the benefit of the party who otherwise would have been entitled to it.[1] Therefore, if the statute has application and if the trustee actually attempted to hold a trust adverse to the initial trust it would have been for the benefit of the beneficiaries (testamentary heirs of Abbie Hoyt) under the initial trust. The argument places a wrong interpretation on the statute and therefore we find it unpersuasive in this instance.

Bogert, Trusts and Trustees (2d ed.) § 951, page 470, states that the statute of limitations will apply from the date the beneficiary knew of the breach or repudiation or by the exercise of reasonable skill and diligence could have learned of it. See also, *United States v. Rose*, 346 F.2d 985 (3d Cir. 1965).

The Iowa Supreme Court, in *Grand Lodge of Iowa of the Independent Order of Odd Fellows v. Osceola Lodge No. 18, Independent Order of Odd Fellows*, 178 N.W.2d

---

1. The beneficiaries are (a) the Grand Lodge if a Home had been built; (b) the heirs of Abbie Hoyt; (c) Lodge No. 14 of Mandan, North Dakota, if it was in existence on and after 1934.

362, 366 (Iowa 1970), after first taking cognizance of its statutory provisions, said:

"In so doing [enacting the legislation] it recognized the well settled rule that when a trustee violates its trust, denies it, or repudiates it, to the knowledge of the beneficiary, a cause of action against the trustee accrues immediately to the beneficiary, thereby causing these limitation statutes to then commence running."

It also, 178 N.W.2d on page 369, quoted with approval from 54 C.J.S. Limitations of Actions § 182(3):

"In order to constitute a repudiation there must be something said or done by the trustee in open contravention of the terms of the trust, and of such character that the relations of the parties will become and continue hostile. The declarations of repudiation must be continuous and consistent, and the circumstances attending the adverse claim or user must be such that the trustee is liable to be sued.

. . .

"There need be no formal renunciation of the trust if the acts of the trustee are equivalent to a repudiation and the cestui has knowledge thereof . . . ."

The Iowa Supreme Court, in *Pap v. Pap*, 247 Iowa 371, 73 N.W.2d 742, 748 (1955), quoted with approval from an earlier case:

"It is an elemental principle of law that as between trustee and cestui que trust, in the case of an express trust, the statute of limitations has no application and no length of time is a bar. Against an express and continuing trust time does not run until repudiation or adverse possession by the trustee and knowledge thereof on the part of the cestui."

In *Knox v. Knox*, 222 Minn. 477, 25 N.W.2d 225 (1946), a case involving a constructive trust, the Minnesota court stated:

". . . the plaintiff [beneficiary] must act with diligence, but this diligence requires no more than that he shall act with reasonable promptness when he has acquired either actual or imputed knowledge of a wrongful withholding. Knowledge will be imputed to the plaintiff [beneficiary] when, by exercise of reason-

able care, he should have known of the circumstances revealing defendant's adverse and inequitable role. . . . [The statute of limitations runs] from the date when the wrongful and adverse holding begins and is, or should be, known to the plaintiff [beneficiary]."

The court found that there was nothing to put Mr. Knox [plaintiff] on notice that his wife held the property adversely until she expressly repudiated her promise to reconvey the land to him.

In *Anderson v. Anderson*, 293 Minn. 209, 197 N.W.2d 720 (1972), the Minnesota court, in an agency case, stated the test to be whether the party had become aware or should have become aware by reasonable diligence, of the action of the agent.

In *Dewey v. Dewey*, 163 Neb. 296, 79 N.W.2d 578 (1956), the Nebraska court stated the rule to be that repudiation may be proved by actual knowledge or notice thereof, or by open, notorious, and unequivocal facts and circumstances from which a beneficiary who is not under any recognized disability would be put on notice that the trust had been repudiated and require him to timely assert his equitable rights.

■ Case law clearly establishes that a repudiation of a trust for the purpose of starting the running of the statute of limitations does not occur until the beneficiary has notice of, or is aware of, or should have been aware of, the repudiation by exercising reasonable diligence.

A brief examination of North Dakota statutory provisions and case law on the basic question will be helpful.

Chapter 59–01, North Dakota Century Code, sets forth general provisions relating to trusts. Section 59–01–09 requires that the trustee act in the highest good faith toward his beneficiary. Section 59–01–13 prohibits a trustee from undertaking another trust adverse in its nature to the interest of the beneficiary without the consent of the beneficiary. Section 59–01–14 requires the trustee to inform the beneficiary immediately upon acquiring or being charged with an interest adverse to the beneficiary's

interest. Section 59–01–15 provides that a violation of certain enumerated sections by the trustee constitutes a fraud against the beneficiary of the trust. Section 59–02–05 requires that a trustee fulfill the purpose of the trust as declared by its creation and must follow the directions of the trustor except as modified by consent of all parties interested. Section 59–02–17 provides that a trust is extinguished by entire fulfillment of its object or upon its object becoming impossible or unlawful. Neither of these occurred.

Taking into account these statutory provisions, we necessarily conclude that before the statute of limitations began to run against the beneficiary on a claimed repudiation by the trustee the beneficiary must have had knowledge of the repudiation and under North Dakota law the trustee is required to inform the beneficiary of any duty or acquisition of an adverse interest to the beneficiary.

The North Dakota Supreme Court, in *Rovenko v. Bokovoy*, 77 N.D. 740, 45 N.W.2d 492 (1950), which involved a constructive trust, held that a trustee may claim the real property of his trust by adverse possession only if he clearly makes his claim of ownership known to the beneficiary and thereafter occupies the property adversely, openly, and notoriously for a long enough period to allow the statute of limitations to run. We believe the standard for an express trust should not be less than the standard or rule of law applied to a constructive trust. If anything, the standard should be higher for an express trust.

Chief Justice Cardozo of the Court of Appeals of New York, in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), wrote:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate."

This standard was adopted by the North Dakota Supreme Court by quoting it with approval in *Rovenko v. Bokovoy, supra*. The need to require high standards of trustees is as great if not greater in the present day than it was when the statement was made. The survival of the trustee concept out of necessity depends upon the law holding the trustees to such high standards.

In *Handy v. Handy*, 207 N.W.2d 245 (N.D.1973), this court said:

"The burden of proof in an action based on adverse possession is upon the person claiming title by such adverse possession. *Martin v. Rippel*, 152 N.W.2d 332 (N.D.1967).

". . . Mere possession and payment of taxes is presumed to be for the benefit of all of the tenants in common, and the appropriation of the rents and profits will not constitute adverse possession. *Hagen v. Hagen*, 137 N.W.2d 234 (N.D.1965)."

The court also observed that a cotenant may oust other cotenants, but his possession, to be rendered adverse, must not only be actual but must also be notorious and hostile and of such a character as to unmistakably indicate the assertion of ownership by the occupant as against his cotenants. *Handy v. Handy, supra*, 207 N.W.2d at 246.

■ The principle of law regarding burden of proof that applies to a cotenant as to adverse possession, as set out in *Hodny, supra*, also applies to trustees, as we have in this instance.

Hodny claims that all of the factors needed to show a repudiation of the trust and adverse possession of the land were present, such as the fact that Bowers, as trustee, failed to transfer the land to the Hoyts as required by the trust deed, but continued renting the land to Pulkrabek and collecting the rents and placing them in an envelope marked for the Knights of Pythias.

Bogert, Trusts and Trustees (2d ed.) § 951, page 475, also states that where the period ends during which the trust was by its terms to continue, and there is no conduct on the part of the remaindermen

which amounts to a consent that the former trustee hold for them under a new trust, or in some other capacity, the possession of the old trustee automatically becomes adverse to that of those persons who are entitled to possession at the end of the trust, and the statute of limitations begins to run. This implies the beneficiary had knowledge.

■ Although there was no evidence that Abbie Hoyt knew of the trust, Hodny claims she was put on notice because the original trust deed was recorded. If she had been diligent, Hodny argues, she would have discovered that the land was to be transferred to her in 1934.

Before the Hoyts could be required to act, it must be shown that they knew not only of the trust deed but of the conditions set forth therein and that the conditions were not satisfied so that the property was to be conveyed to the Hoyts. A mere showing that the original trust deed by Comfort Hoyt to the trustees was on record is not adequate. It would have to be shown that the conditions of the trust deed were not satisfied and that the Hoyts, or the beneficiaries under the trust deed, had knowledge that the conditions had not been satisfied. Until the beneficiaries had knowledge that the conditions of the deed had not been satisfied they could not be charged with the knowledge required to put the statute of limitations in operation. The beneficiaries cannot be charged with having failed to assert any rights they may have had without first having knowledge of what rights they may have had.

There are cases indicating that under the appropriate circumstances, and particularly where the repudiative act is a matter of public record, the beneficiary of an express trust may be chargeable with constructive notice of the repudiation by the trustee, with the result that, from the time he is chargeable with such notice, the statute of limitations will run against him. 76 Am. Jur.2d Trusts § 591, page 798. Because of the statutory provisions (Chapters 59–01, 59–02, NDCC) and North Dakota case law, we do not believe such cases have application here under these facts. Furthermore,

the repudiation, if there was any, was not recorded. Only the trust deed was.

Section 47–19–19, NDCC, states:

"The record of any instrument shall be notice of the contents of the instrument, as it appears of record, as to all persons."

As to adverse possession, § 28–01–11, NDCC, provides:

"For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument nor upon a judgment or decree, land shall be deemed to have been possessed and occupied only in the following cases:

"1. When it has been protected by a substantial inclosure; or

"2. When it has been usually cultivated or improved."

The land was enclosed on three sides prior to 1934 and in that year the fourth side was fenced.

The statute of limitations, § 28–01–04, NDCC, provides:

"No action for the recovery of real property or for the possession thereof shall be maintained, unless the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the premises in question within twenty years before the commencement of such action."

■ Because of our conclusion that the trial court was correct, as stated later herein, that there was no repudiation of the trust, neither the adverse possession provision nor the statute of limitations has any application in this case.

The trust involved here was not a continuing trust where the trustee was given powers indefinitely, but one which was to end upon the happening of an event or the passage of a certain period of time. Also, there is the fact that there were two potential beneficiaries under the trust. It could be said that Bowers never repudiated the trust because he continued to act as trustee after 1934. He was merely holding the land for the wrong party. Although we don't know what Bowers' reasons were for

his actions, we must presume that, as a trustee, he acted in good faith and attempted to locate the Hoyt heirs. Failing to find them, his only recourse was to continue holding the land and collecting the rent and placing it in an envelope for the Knights of Pythias as he had prior to 1934.

A trustee's continued recognition or acknowledgment of the trust is generally regarded as showing, or strongly indicating, that he had not repudiated it up to the time of such recognition or acknowledgment. 76 Am.Jur.2d Trusts § 591, page 799.

It has been held that the mere ending of the trust, with no account rendered, or settlement had or demanded, does not cause the statute to run, simply because the cestui leaves the trust property with the trustee. Bogert, *supra,* p. 475.

The court, in *England v. Winslow,* 196 Cal. 260, 237 P. 542 (1925), cited in 54 A.L. R.2d 168, stated:

> "To permit this trustee of a voluntarily assumed trust to assert successfully that his mere failure or neglect to perform his duty to account for and turn over the money of the estate in his possession as such trustee rendered his trust wrongful so as to set in motion the statute of limitations in his favor would not only serve to defeat these statutory provisions of the Code, but would have the effect of imperiling every other express or voluntarily assumed trust . . . by the mere failure of an erring or neglectful trustee to perform his duty in promptly accounting for or paying over the proceeds of his trust. The only way in which the trustee of an express or voluntary trust can set the statute of limitations in operation in his favor with respect to it or its properties in his hands is by a distinct act of repudiation amounting to a denial of its existence, and no mere tacit failure of the trustee to perform his duty in respect to such trust could or should be held to amount to a repudiation of it so as to set the statute of limitations in motion in his favor and as a result of his own neglect of duty."

Hodny also claims that Hoyt is barred from claiming an interest in the land by the Marketable Record Title Act, Chapter 47–19A of the North Dakota Century Code, and the affidavit made and filed by Mr. and Mrs. Hodny purportedly in accordance with § 47–19A–01.

However, as pointed out by the trial court in its memorandum opinion, the Marketable Record Title Act, according to the provisions of § 47–19A–11, which sets forth exceptions, provides that the Act shall not apply to any rights of any remaindermen upon the expiration of any life estate or trust created before the recording of a deed of conveyance set out in § 47–19A–01. The rights established by the trust created by Comfort Hoyt are not affected by the Act.

We examined the article in 29 N.D.L.Rev. 265 written by James E. Leahy, entitled *The North Dakota Marketable Record Title Act* in which the author believed that the North Dakota Legislature, in providing for the exemptions in § 47–19A–11, NDCC, had in mind *Lane v. Travelers Insurance Co. of Hartford, Conn.,* 230 Iowa 973, 299 N.W. 553 (1941), an Iowa case in which children under the Iowa Act were deprived of contingent future interests. On page 273, the author said:

> "In excluding the operation of the Act, remaindermen who will succeed to an interest in real estate upon termination of a life estate or trust, the legislature probably had in mind the *Lane* case, discussed heretofore. . . .
>
> "In providing that holders of mortgages and trust deeds need not file a notice of claim within the 30 (31) year period, it is apparent that the legislature had in mind long term instruments and those instruments which may have been extended by payments which do not appear of record."

We agree with the trial court that the Marketable Record Title Act, Chapter 47–19A, does not apply to the trust under consideration in this instance.

Hodny also claims the burden is upon the Hoyt heirs to establish their right and claim

to the property. He argues he has a valid chain of title to the property leading from Comfort Hoyt to the trust deed from the trustees to the Knights of Pythias, and from there to himself, and because there is no record of a conveyance transferring the property to the Hoyt heirs and because he has secured his title and commenced an action to quiet title the Hoyts, even though they are defendants, have the burden of proving that they are entitled to the property. In support thereof he cites Syllabus 6 in *Robertson v. Brown*, 75 N.D. 109, 25 N.W.2d 781 (1947), wherein the court said:

"Where a defendant in an action to quiet title alleges that he is the owner of land and prays that title be quieted in him, he assumes the burden of proving his allegations and in effect becomes a party plaintiff."

Hodny argues that the Hoyts need to establish that Mandan Lodge No. 14 was not in existence ten years from the date of the trust deed or that the Grand Lodge did not build a Home or Lodge as specified in the trust deed in order to become entitled to the property.

We cannot accept this argument because the burden of proof is on the party claiming adversely [*Brooks v. Bogart*, 231 N.W.2d 746 (N.D.1975)] and such proof must be accomplished by clear and convincing evidence [*Cranston v. Winters*, 238 N.W.2d 647 (N.D.1976)]. But even if we were to agree with this argument, it would make little difference in this case because the pertinent facts have been established or judicially determined. There is no dispute that a Home was not built in or near Mandan and it was judicially determined that Mandan Lodge No. 14 was no longer in existence in 1934. There is no evidence, other than the recording of the trust deed which does not constitute sufficient evidence, that the Hoyts, or their heirs, had knowledge that the conditions of the trust were not satisfied so as to require the trustee to convey the property to the Hoyts. The Hoyts cannot be charged with knowledge of the alleged repudiation, if there was in fact a repudiation. We cannot as a

matter of law conclude that the trustees repudiated the trust. Mere inaction by trustees under the circumstances as we have here and a continuation of an act initiated with the receipt of the trust deed does not legally constitute a repudiation. If the conveyance of the land in question on November 10, 1975, to the Grand Lodge by the court-appointed successor trustees may or could be considered a repudiation of the Comfort Hoyt Trust, it would not be of any avail to the Hodnys because the time interval would not have been long enough to permit the application of either the statute of limitations or the doctrine of laches.

We believe that in instances of this kind, where the mere trust deed and its conditions have been presented, it becomes incumbent upon anyone claiming the property under a deed from the trustees to establish that certain conditions existed or that certain requirements have been satisfied to justify the action of the trustees.

We conclude that Hodny under these circumstances was required to establish that the conditions of the trust deed have been met so as to justify the chain of conveyances under which he claims. In this particular instance, the justification would have to rest upon a Home having been built by the Grand Lodge in or about the vicinity of Mandan or in the alternative that Lodge No. 14 existed ten years after the date of the trust deed so that the property would then be conveyed to Lodge No. 14. If the latter, then the land should have been conveyed to Mandan Lodge No. 14 and not to the Grand Lodge, as was done, in view of the specific provision of the Trust. The conveyance by trustee to Grand Lodge was not pursuant to any authority implied or otherwise and as such the Hoyt heirs were entitled to challenge the conveyance.

Hodny argues that the Hoyts are barred by the doctrine of laches from asserting title to the land.

Hodny claims that the failure of the Hoyts to assert their claim for almost forty years has so harmed his case, because all evidence has long since been lost, that it

would be inequitable to allow the Hoyts to claim the land now.

Hodny cites from III Scott on Trusts (3d ed.) § 219.1, page 1760, to support his contention:

"Under some circumstances, however, the beneficiary is guilty of laches if he does not take affirmative steps to enforce the trust, even though it does not affirmatively appear that the trustee had repudiated the trust. This is the case where the trustee is under a duty to convey the trust property to the beneficiary and fails to make the conveyance for such a time and under such circumstances that the beneficiary is fairly chargeable with laches."

The passage goes on to say:

"In cases of this sort it has been held that where the beneficiary has long delayed in asserting his rights and the circumstances are such that it has become difficult to prove whether or not there ever was a trust or whether the trust has been performed, the beneficiary is precluded by laches from maintaining a suit to enforce the trust."

There is no doubt here that there was a trust and that it has not been performed.

"Laches does not grow out of the mere passage of time. It is founded upon the inequity of enforcing a claim where there has been a change in the conditions or relations of the property or parties." *Dewey v. Dewey,* 163 Neb. 296, 79 N.W.2d 578, 584 (1956).

See also, *Richland County v. State,* 180 N.W.2d 649 (N.D.1970); *Adams v. Little Missouri Minerals Ass'n,* 143 N.W.2d 659 (N.D.1966), for North Dakota cases discussing laches on matters not involving trusts.

The court found that there was no prejudice caused by the delay and that there had been no change in relations or conditions except that people had died.

A beneficiary is not barred by laches from holding a trustee liable for breach of trust if he did not know or have reason to know of the breach of trust. III Scott on Trusts (3d ed.) § 219.2, page 1761. *In re*

*Mueller's Trust,* 28 Wis.2d 26, 135 N.W.2d 854 (1965).

The trial court found, and we agree, that the Hoyts had no knowledge of the trust provisions, did not know of the alleged repudiation of the trust [How could they if there wasn't any?], and were not barred by the statute of limitations.

The same rule applies to a claim of laches. The party will not be barred from asserting a claim when he has no knowledge that there has been a repudiation of the trust.

After having carefully considered the arguments and contentions of the parties, we conclude that the trial court did not commit reversible error.

The judgment of the trial court is affirmed.

ERICKSTAD, C. J., and PAULSON and VOGEL, JJ., concur.

PEDERSON, Justice.

I dissent.

Hodny was entitled to the benefits of the presumption that the Mandan Lodge, which was once in existence, continued to exist in 1934, and that the trustees did fulfill their duty to convey the land to the Mandan Lodge in 1934 (§ 31–11–03(31), (36), NDCC). Although there is circumstantial evidence that the Mandan Lodge did not exist in 1934, one who attempts to prove a negative fact has a greater burden.

"Negative testimony—that is, that a fact did not exist, * * * is admissible, and, in the absence of opposing testimony, is usually regarded as of sufficient probative force to sustain a verdict. It is, however, a long-recognized general rule of evidence that all other things being equal, positive evidence is stronger than negative evidence." 30 Am.Jur.2d Evidence, § 1092, at 252.

When the trial court failed to acknowledge the necessity for the Hoyts to overcome these presumptions, an error was committed as a matter of law. Justice requires a retrial.